Glenn HEGAR, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas, Appellants

v.

GULF COPPER AND MANUFACTUR-ING CORPORATION, Appellee

NO. 03-16-00250-CV

Court of Appeals of Texas, Austin.

Filed: August 11, 2017

Mr. Charles K. Eldred, Assistant Attorney General, Financial Litigation, Tax, and Charitable Trusts Division, P. O. Box 12548, Austin, TX 78711, for Appellants.

Mr. James F. Martens, Ms. Danielle V. Ahlrich, Martens, Todd, Leonard, & Ahlrich, 301 Congress Ave., Suite 1950, Austin, TX 78701, Ms. Amanda G. Taylor, Beck Redden, LLP, 515 Congress Avenue, Suite 1900, Austin, TX 78701, for Appellee.

Before Chief Justice Rose, Justices Field and Bourland

## OPINION

Scott K. Field, Justice

Gulf Copper and Manufacturing Corporation sued Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas (collectively, the State), seeking a refund of franchise taxes that Gulf Copper paid under protest. *See* Tex. Gov't Code §§ 403.201-.221 (governing protest suit after payment under protest); Tex. Tax Code §§ 112.001-.156 (governing taxpayer suits). Gulf Copper asserted that the State erroneously denied it a revenue exclusion it had claimed for payments made to its sub-

contractors during the relevant tax year.[1] In the alternative, Gulf Copper asserted it was entitled to deduct the subcontractor payments as "cost of goods sold" (COGS).[2] Gulf Copper also asserted that the State erroneously excluded certain costs Gulf Copper had included in its calculation of its COGS deduction, resulting in a smaller COGS deduction and, correspondingly, Gulf Copper's owing additional franchise taxes. Following a bench trial, the trial court concluded that Gulf Copper was entitled to a revenue exclusion for the subcontractor payments or, alternatively, was permitted to include the subcontractor payments in its COGS deduction. The trial court also concluded that Gulf Copper was entitled to deduct all of the costs it had included in its original COGS calculation. The court rendered judgment ordering the State to pay Gulf Copper $838,117.84, the entire amount it had paid under protest, plus statutory interest and costs allowed by law. On appeal, the State asserts that the trial court erred in its conclusions regarding both the revenue exclusion and the COGS deduction. We agree with the trial court that Gulf Copper was entitled to claim a revenue exclusion for the subcontractor payments. However, because on this record we cannot uphold the trial court's findings regarding the amount of Gulf Copper's COGS deduction, we will reverse the trial court's judgment and remand the cause to the trial court for further proceedings.

1. See Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013) (current version at Tex. Tax Code § 171.1011(g)(3)) (excluding certain "flow-through funds" from taxpayer's "total revenue").

2. See Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 8 (amended 2013) (current version at Tex. Tax Code § 171.101(a)) (allowing taxpayer to elect to deduct COGS from total revenue); Act of May

## DISCUSSION

This Court has previously provided overviews of the current Texas franchise-tax scheme, originally enacted in 2006, which assesses franchise taxes against a taxable entity's "taxable margin." *See Titan Transp., LP v. Combs*, 433 S.W.3d 625, 627-29 (Tex. App.—Austin 2014, pet. denied); *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47-48 (Tex. App.—Austin 2013, no pet.). Under the current franchise-tax scheme, franchise taxes are assessed against a taxable entity's "taxable margin." Tex. Tax Code § 171.002(a). The franchise-tax statute has been substantively amended several times since its enactment, and the provisions applicable to this case are those that were in effect on January 1, 2009.[3] Under that version of the franchise-tax statute, the taxable entity first calculates its "total revenue" in the manner directed by Tax Code section 171.1011. *See id.* § 171.1011 (determination of total revenue). In general, total revenue is income reported to the federal Internal Revenue Service less various categories of revenue that the statute specifies are to be excluded, excepted, deducted, or otherwise limited. *Id.* For example, all taxpayers may deduct certain flow-through funds, while only taxable entities in select industries are permitted to exclude other types of flow-through funds. *Compare id.* § 171.1011(f), (g) (flow-through-funds exclusions) *with id.* (g-1), (g-3), (g-4) (flow-

19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 13-16 *as amended by* Act of June 15, 2007, 80th Leg., ch. 1282, §§ 14, 15, 2007 Tex. Gen. Laws 4282, 4290-91 (amended 2013) (current version at Tex. Tax Code § 171.1012) (governing calculation of COGS deduction).

3. Citations in this opinion will be to the current version of the Tax Code when intervening amendments are not relevant to the disposition of the issues on appeal.

through-funds exclusions for specific industries); *see also In re Nestle USA, Inc.*, 387 S.W.3d 610, 615 (Tex. 2012) (discussing franchise-tax scheme). "A manifest purpose of excluding 'flow-through funds' is to except from taxation gross receipts that do not constitute actual gain or income to the taxpayer." *Titan Transp.*, 433 S.W.3d at 628.

After calculating total revenue, the taxpayer computes its "taxable margin" by first determining its "margin." *See* Tex. Tax Code § 171.101(a)(1) ("The taxable margin of a taxable entity is computed by ... determining the taxable entity's margin."). The "margin" is the lesser of (1) 70% of the taxable entity's total revenue or (2) the taxable entity's total revenue minus, at the entity's election, either cost of goods sold, as determined under section 171.1012 (the COGS calculation) or compensation, as determined under section 171.1013 (the compensation calculation). *See* Act of May 19, 2006, 79th Leg., 3d C.S., ch.1, § 5, 2006 Tex. Gen. Laws 1, 8, *as amended by* Act of·June 15, 2007, 80th

Leg., ch. 1282, § 11, 2007 Tex. Gen. Laws 4282, 4287 (amended 2013) (current version at Tex. Tax Code 171.101).[4] After applicable deductions have been taken, "taxable margin" is determined by apportioning the adjusted revenue between in-state and out-of-state business and, except for E-Z computation filers, subtracting any other allowable deductions. *Id.* §§ 171.101(a)(2), (3), ·.1016(b)(2), (c). The franchise-tax obligation is determined by multiplying the "taxable margin" by the applicable tax rate. *Id.* § 171.002.

### Nature of Gulf Copper's Business Activities [5]

Gulf Copper is a corporation primarily engaged in the business of surveying, manufacturing, upgrading, and repairing offshore drilling rigs. Gulf Copper's work enables the drilling rigs to (1) obtain and maintain the certification requirements imposed by marine classification societies;[6] (2) comply with regulations, both state and federal, applicable to offshore drilling rigs and their operations;[7] and (3) meet the

---

4. Not relevant to this case is the option to use the E-Z computation method to determine margin for taxable entities whose total revenue is $20 million or less. *See* Tex. Tax Code § 171.1016 (E-Z computation method and rate for taxpayers with no more than $20 million in total revenue).

5. The following description of Gulf Copper's business activities is derived from unchallenged findings of fact made by the trial court and from testimony elicited at trial, which, unless otherwise indicated, is undisputed.

6. A marine classification society is a non-governmental organization that establishes and maintains technical standards for the construction and operation of marine vessels. Steven Hale, Gulf Copper's Chairman and Chief Executive Officer, testified that the International Association of Classification Societies promulgates rules and regulations that offshore drilling rigs have to meet to operate safely and in an environmentally sound manner. According to Hale, the classification standards are met through a regimen of inspec-

tions and surveys on a prescribed, periodic basis to ensure the integrity and safety of the vessel. That a rig·meets classification rules and standards is of critical importance to both an exploration and production company considering using a particular rig on its project and to the underwriter who insures the drilling rig.

7. Hale testified that offshore drilling rigs and their operations are subject to regulations promulgated by entities such as the United States Coast Guard, the Environmental Protection Agency, the International Maritime Organization, and the "Bureau of Offshore Environmental Management." We assume that the last reference was to the Bureau of Ocean Energy Management, one of three independent entities created when the federal Minerals Management Service was reorganized in the wake of the Deepwater Horizon oil spill. The Bureau's mission is "managing development of· the nation's offshore resources in an environmentally and economically responsible way." *See The Reorganiza-*

requirements imposed by contracts entered into between exploration and production companies and the drilling rigs' owners related to specific drilling projects.[8] The drilling rigs are delivered to Gulf Copper's facility where Gulf Copper performs the work to satisfy the requirements of the particular classification society certifying the drilling rig, the other regulatory authorities involved, the drilling rig's owner representative, and often a representative from the exploration and production company for whose project the drilling will be performed. Gulf Copper repairs rigs by removing defective portions, manufacturing replacement components, and installing the replacement components on the rigs. Gulf Copper also manufactures and installs new components for rigs that do not replace an existing component.

Gulf Copper also owns all the outstanding shares of a subsidiary named Sabine Surveyors, a limited partnership primarily engaged in the business of marine vessel surveying. Hale testified that Sabine Surveyors inspects marine vessels, including offshore drilling rigs, and cargo. Surveys are also conducted after a drilling rig is involved in a collision with another vessel while it is offshore and the owner or underwriter requests an inspection to determine the extent of the damage. According to Hale, in certain circumstances Sabine Surveyors must "separate itself from" Gulf Copper's shipyard activities because it might be deemed a conflict of interest for Sabine Surveyors to refer a job for which Sabine Surveyors represents the drilling rig's underwriter to Gulf Copper. Hale testified that Sabine Surveyors also prepares

"desk appraisals" of drilling rigs for use by entities with a financial interest in a rig.

### Gulf Copper's Franchise-Tax Dispute

The underlying tax protest concerns Gulf Copper's 2009 franchise-tax report. Gulf Copper excluded from its total gross revenue $79,405,230 in "flow-through" payments to subcontractors, which, along with other exclusions amounting to $163,303,[9] reduced its total revenue from $173,875,422 to $94,306,889. Gulf Copper then elected to use the COGS deduction to calculate its margin, subtracting $70,396,219 from its total revenue to arrive at a margin of $23,910,670. Gulf Copper calculated its apportionment factor at 0.8808, application of which resulted in a taxable margin of $21,060,518. Accordingly, Gulf Copper reported a franchise-tax obligation of $210,605.18—1% of its taxable margin—which it timely paid in full.

In claiming a revenue exclusion of $79,405,230, Gulf Copper relied on former section 171.1011(g)(3) of the franchise-tax statute, which provided:

A taxable entity shall exclude from its total revenue, to the extent [reported to the federal IRS as income], only the following flow-through funds that are mandated by contract to be distributed to other entities:

. . . .

(3) subcontracting payments handled by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of the boundaries of real property.

---

*tion of the Former MMS*, BOEM.GOV, http://www.boem.gov/Reorganization/ (last visited June 15, 2017).

8. Hale testified that individual wells have "different requirements relative to the equipment on the rig."

9. The Comptroller does not dispute that the $163,303 qualified for a revenue exclusion.

Act of May 19, 2006, 79th Leg., 3d C.S., ch.1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013) ("the (g)(3) revenue exclusion" or "former section 171.1011(g)(3)"). After conducting an audit, however, the Comptroller determined that the $79,405,230 in payments to subcontractors did not meet the requirements for the (g)(3) revenue exclusion. Instead, the Comptroller determined that the subcontractor payments should be considered in the calculation of Gulf Copper's COGS deduction. The Comptroller also audited the amount that Gulf Copper had calculated as its COGS deduction and significantly pared down the expenses it believed could properly be included in the COGS calculation. In essence, the Comptroller concluded that only costs either directly or indirectly related to "fabrication" of goods could properly be included in the calculation of Gulf Copper's COGS deduction.

After concluding its audit, the Comptroller determined that Gulf Copper had: (1) $163,303 in allowed revenue exclusions,[10] and (2) a total COGS deduction of $77,140,769. As a consequence of moving the subcontractor payments from the (g)(3) revenue exclusion, Gulf Copper's apportionment factor increased from 0.8808 to 0.9353. The Comptroller thus calculated that Gulf Copper had an additional franchise tax obligation for franchise-tax report year 2009 of $692,626.66. Gulf Copper paid the assessed deficiency plus interest (a total of $838,118.00) under protest. See Tex. Tax Code § 112.051. Along with its protest payment, Gulf Copper submitted a letter to the Comptroller outlining its reasons for claiming the (g)(3) revenue exclu-

sion for subcontractor payments and explaining its method of calculating its COGS deduction. Gulf Copper subsequently filed the underlying lawsuit, seeking a refund of all amounts paid under protest. Gulf Copper maintained that it was entitled to take the (g)(3) revenue exclusion based on the nature of its business activities and its contractual obligations to make the excluded payments to subcontractors who were performing activities in connection with oil and gas well construction and improvement. Gulf Copper asserted that the subcontractors were engaged in providing services, labor, and materials in the form of manufacturing, constructing, developing, improving, creating, and installing component parts for offshore drilling rigs used to construct, remodel, or repair oil and gas wells, which it contended are improvements on real property. Gulf Copper claimed that the payments to its subcontractors satisfied the statutory prerequisites for claiming the (g)(3) revenue exclusion because (1) the payments were mandated by contract, (2) to be paid to an entity other than Gulf Copper (the taxable entity), and (3) the funds paid to the subcontractors were for the provision of "services, labor, or materials in connection with the actual or proposed . . . construction, remodeling, remediation, or repair of improvements on real property." See id. § 171.1011(g)(3).[11]

Gulf Copper also asserted that the Comptroller had improperly limited the costs that could be included in the calculation of its COGS deduction. Gulf Copper challenged the Comptroller's conclusion

---

10. This number is the difference between the total flow-through revenue exclusions Gulf Copper originally took minus the $79,405,230 in subcontractor payments the Comptroller determined were not properly excluded from revenue as qualifying flow-through funds under the (g)(3) revenue exclusion.

11. Relatedly, Gulf Copper asserted that, by refusing to allow Gulf Copper to claim the subcontractor payments as a revenue exclusion, the Comptroller had erroneously increased Gulf Copper's apportionment factor from 0.8808 to 0.9353.

that none of Gulf Copper's expenses could be included in COGS pursuant to Texas Tax Code subsection 171.1012(i). This subsection provides that "[a] taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance [ ] of real property is considered to be an owner of that labor or materials and may include the costs, as allowed by [section 171.1012], in the computation of cost of goods sold." *Id. §. 171.1012(i); see Hegar v. CGG Veritas Servs. (U.S.), Inc.*, No. 03-14-00713-CV, 2016 WL 1039054, at *3 (Tex. App.—Austin Mar. 9, 2016, no pet.) (mem. op.) (taxable entity that provides "labor and materials" to project for the construction or improvement of real property, which includes oil and gas wells, is entitled to include costs of that labor and materials, as allowed by section 171.1012, in computation of its cost of goods sold and deduct that amount from its total revenue to calculate its "margin" for franchise-tax purposes); *Newpark Res.*, 422 S.W.3d at 54-57 (holding that, under Texas Tax Code subsection 171.1012(i), certain labor expenses of subsidiary that does not itself produce "goods" but that does supply labor to projects for construction of real property improvements may be included in combined entity's COGS calculation, and that term "labor" in statute encompasses wide range of labor expenses, including those associated with activities that might also be described as "services"). The Comptroller had concluded that Gulf Copper did not have any expenses that could be included in the calculation of the COGS deduction by virtue of being costs of labor

or materials furnished to a project for construction or improvement of real property under section 171.1012(i) and, consequently, it could only include in its COGS calculation the direct and some indirect costs of acquiring or producing "goods." [12] *See* Tex. Tax Code § 171.1012(c), (d), (f). In the Comptroller's view, each of Gulf Copper's facilities [13] was engaged in both fabrication and non-fabrication activities and only the costs of labor and materials associated with the fabrication activities were "costs of acquiring or producing goods" that could properly be included in calculating the COGS deduction.

At trial, the evidence concerning Gulf Copper's business operations was essentially undisputed. The parties joined issue, however, on whether the subcontractor payments qualified for the (g)(3) revenue exclusion as payments made "to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property." *See id.* § 171.1011(g)(3). The Comptroller took the position that the work the subcontractors performed was "two steps away" from actual or proposed construction of improvements on real property and therefore was too "remote or attenuated" from any actual or proposed construction to meet the "in connection with" requirement to qualify for the (g)(3) revenue exclusion. In the alternative, the Comptroller argued that if the subcontractor payments met the "in connection with" requirement, only a portion of those payments ($32 million of

12. "Goods" are defined as "real or tangible personal property sold in the ordinary course of business of a taxable entity." Tex Tax. Code § 171.1012(a)(1). "Tangible personal property" does not include intangible property or services. *Id.* § 171.1012(a)(3)(B).

13. Gulf Copper's facilities include yards in Galveston, Port Arthur, and Corpus Christi. Gulf Copper also owns Sabine Surveyors, which the Comptroller determined only services and thus did not incur any costs related to acquiring or producing goods that could be included in the calculation of Gulf Copper's COGS deduction.

the $79.4 million total) met the requirement that they be "mandated by contract" to be distributed to other entities. *See id.* § 171.1011(g). The parties also continued to be in sharp disagreement about the correct method for calculating Gulf Copper's COGS deduction.

After a three day bench trial, the trial court rendered judgment in Gulf Copper's favor and ordered the State to refund the entire amount paid under protest. The trial court also made the following relevant findings of fact:

FOF 2: Sabine Surveyors is a limited partnership primarily engaged in the business of marine vessel surveying.

FOF 9: Gulf Copper's customers are primarily rig owners and drilling contractors who use their offshore rigs to drill for oil and gas on behalf of exploration and production ("E&P") companies.

FOF 10: Gulf Copper is primarily engaged in the business of surveying, manufacturing, upgrading, and repairing offshore drilling rigs.

FOF 12: Gulf Copper repairs rigs by removing defective portions, manufacturing replacement components, and installing the replacement components onto the rigs. Gulf Copper also manufactures and installs new components for rigs that do not replace an existing component.

FOF 15: In completing its work, Gulf Copper utilizes all aspects and the entire breadth of its facility yards, whether the rig sits on the dry docks, in the yard, or in the water. This includes the lay down areas, the warehouses, the fabrication shops, the welding areas, and the stacking areas.

FOF 16: Gulf Copper's work enables the rigs (1) to meet and maintain the certification requirements imposed by classification societies, (2) to comply with gov-

erning regulations, and (3) to satisfy an exploration and production ("E&P") company's contractual requirements for a specific drilling project.

FOF 17: A rig cannot be used for drilling unless it is properly certified, compliant, and satisfies the contractual requirements for the project.

FOF 19: Rig owners do not hire Gulf Copper to repair or upgrade their rigs or manufacture new components unless they have a revenue-generating contract in place for the drilling of offshore oil and gas wells.

FOF 20: Offshore drilling rigs are necessary and essential to the drilling of offshore oil and gas wells because the wells could not be drilled without the drilling rigs.

The State then perfected this appeal. The State's three appellate issues reduce to a challenge to the trial court's judgment on the grounds that (1) the trial court erroneously agreed that Gulf Copper could exclude from its revenue the $79.4 million in subcontractor payments pursuant to the (g)(3) revenue exclusion and (2) the trial court erred by concluding that Gulf Copper's COGS calculation was correct, leading to an oversized COGS deduction, regardless of whether the subcontractor payments were considered in the COGS calculation rather than excluded from revenue.

## DISCUSSION

### *Eligibility of Subcontractor Payments for the (g)(3) Revenue Exclusion*

The (g)(3) revenue exclusion requires that a taxpayer exclude from total revenue certain flow-through funds "that are mandated by contract to be distributed to oth-

er entities."[14] During franchise tax year 2009, Gulf Copper used subcontractors to perform a significant portion of the work it did for its customers. There were essentially two types of subcontractors working for Gulf Copper. First, there were "labor" subcontractors that provided workers who performed the same types of tasks performed by Gulf Copper's employees. Hale testified that Gulf Copper used a significant number of workers provided by "labor" subcontractors in franchise tax year 2009 because there was both (1) an increased volume of work due to increased offshore drilling activity and (2) displacement of a portion of Gulf Copper's regular workforce caused by hurricanes in the area. According to Hale, Gulf Copper was required to look outside its geographical region and locate subcontractors who could provide welders, fitters, and other workers to work alongside Gulf Copper's employees. The "labor" subcontractors charged Gulf Copper a rate of $35 to $38 per hour per worker.[15] Gulf Copper in turn billed its customers for work performed by the "labor" subcontractors' workers at a rate of $54 per hour per worker. Gulf Copper included as "flow-through funds" in its (g)(3) revenue exclusion only the $35 to $38 per hour per worker it paid the "labor" subcontractor supplying the workers. The remaining $16 to $19 per hour Gulf Copper received from its customers for work done

by workers provided by the "labor" subcontractors was not included in the (g)(3) revenue exclusion.

The second type of subcontractor was "outside specialty" subcontractors hired to provide workers to perform certain specialized tasks such as finishing out the accommodations on a rig or doing electrical work. The "outside specialty" subcontractors were, at times, designated to be used for certain tasks by the customers, who had preexisting relationships with those subcontractors. Gulf Copper charged its customers for the work done by the "outside specialty" subcontractors an amount 15 to 20 percent greater than the amount the "outside specialty" subcontractor charged Gulf Copper. Gulf Copper included as "flow-through funds" in its (g)(3) revenue exclusion only the amount it paid to the "outside specialty" subcontractor and did not include the additional revenue it received from its customers as a result of the 15 to 20 percent upcharge.

On appeal the State agrees, as it did at trial, that the amounts paid to the "outside specialty" subcontractors constitute flow-through funds mandated by contract to be distributed to other entities and may be included in the (g)(3) revenue exclusion. With respect to payments to the "labor" subcontractors, however, the State main-

14. Effective January 1, 2014, section 171.1011(g)(3) was amended to require the exclusion of "flow-through funds that are mandated by contract *or subcontract* to be distributed to other entities" and that are "*subcontracting payments made under a contract or subcontract entered into by the taxable entity* to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property or the location of the boundaries of real property." Tex. Tax Code § 171.1011(g)(3) (emphases added). The bill analysis for this enactment indicates that the amendment was proposed in response to the Comptroller's

interpretation of section 171.1011(g)(3) as "allowing an entity to exclude subcontracting payments only when the entity has a contract in place that states that a specific portion of the work will be subcontracted" because the Comptroller's interpretation was not consistent with the practices of the affected industry. Senate Research Ctr., Bill Analysis, Tex. H.B. 2766, 83d Leg., R.S. 2013.

15. The record does not reflect what portion of the hourly rate that the "labor" subcontractors charged Gulf Copper for its workers was ultimately paid to the workers themselves.

tains that because Gulf Copper's contracts with its customers do not "mandate that their payments flow through Gulf Copper to the subcontractors providing the regular labor" those payments do not qualify for the (g)(3) revenue exclusion.

■ The State's position is contrary to the plain language of the statute and to this Court's previous holding in *Titan Transportation*. The statute requires Gulf Copper to exclude from its total revenue calculation certain flow-through funds that were mandated by contract to be distributed to other entities. *See* Tex. Tax Code § 171.1011(g). As this Court held in *Titan Transportation*, the "mandate" may be contained in either a contract with the customer or in a contract with the subcontractor. *See Titan Transp.*, 433 S.W.3d at 641. An agreement between Gulf Copper and a "labor" subcontractor constitutes a contract. The evidence and exhibits admitted at trial, including contracts with the "labor" subcontractors who supplied the individuals performing the regular labor, establish that Gulf Copper was obligated by those contracts to pay the "labor" subcontractors for that labor.[16] Thus, Gulf Copper was contractually obligated to pass on to the "labor" subcontractors—other entities of the type referenced in the statute—a fixed portion of the customer's $54 per hour per worker payment, typically

between $35 and $38 per hour per worker. Gulf Copper's contracts with its "labor" subcontractors satisfy "the statutory requirement that qualifying payments be contractually mandated to someone other than the taxpayer." *Id.*[17]

The Comptroller also maintains that the $79,405,230 in subcontractor payments do not qualify for the (g)(3) revenue exclusion because the work done in exchange for those payments was too remote or attenuated to constitute the provision of "services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property." Tex. Tax Code § 171.1011(g)(3). Specifically, the Comptroller argues that, although Gulf Copper's work on the rigs adds value to the rigs, that work does not itself add value to any actual or proposed construction of oil wells, which it concedes are improvements on real property. The Comptroller points out that Gulf Copper does not have contracts with and is not liable to the exploration and production companies that actually drill the oil wells and does not perform any work on the oil wells themselves. According to the Comptroller, the fact that Gulf Copper is "two steps removed" from the construction of the improvement on real property itself

---

16. For example, Gulf Copper's Master Service Agreement with Maxum Industries, LLC, a "labor" subcontractor, contains the following provision:

> [Gulf Copper] shall pay [Maxum Industries, LLC], subject to [Gulf Copper's] verification that [Maxum Industries, LLC] has complied with all terms and conditions of this Agreement and any applicable Purchase Order. In the event [Gulf Copper] should dispute any part of an invoice, undisputed portions thereof shall be paid; and upon resolution of all disputed items, a supplemental invoice will be submitted to [Gulf Copper] for payment.

An email exchange between principals from Gulf Copper and Maxum Industries, LLC provides the hourly rates Gulf Copper was to pay for welders, fitters, superintendents, and leadmen, ranging from $36.50 to $37.50 per hour.

17. As this Court noted in *Titan Transportation*, "an evident purpose of the (g)(3) revenue exclusion is to prevent double taxation of funds that are not truly gain or income to the taxpayer." *Titan Transp., LP v. Combs*, 433 S.W.3d 625, 641 (Tex. App.—Austin 2014, pet. denied). That purpose is served when, as here, the taxpayer excludes from its revenue the portion of payments received that it must pass on to another entity.

(the oil well) precludes it from falling within the "logical limit" the Legislature intended to impose on the phrase "in connection with" used in the statute.

This Court has previously described the phrase "in connection with" as one "of intentional breadth," but not without "logical limit." *Titan Transp.*, 433 S.W.3d at 637. The Court delineated the contours of the "in connection with" requirement as follows:

> As used in former section 171.1011(g)(3), the phrase "in connection with" can only be read as requiring some reasonable nexus between the services, labor, and materials for which the taxpayer pays a subcontractor and "the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of boundaries of real property." [ ] Given its context, the only plausible interpretation of the "in connection with" language employed in the (g)(3) revenue exclusion is that there must be a reasonable—i.e., more than tangential or incidental—relationship between the activities delineated in the statute and the services, labor, or materials for which the subcontractors receive payment. . . . The critical inquiry [ ] is whether the services, labor, or materials provided have a reasonable connection to construction, remodeling, design, or repair work on real property.

*Id.* at 638-39. The inquiry, then, is whether the activities performed by the subcontractors for Gulf Copper have a reasonable connection to the construction of oil wells, which we have held, and the parties do not dispute, are improvements on real property. *See Newpark Res.*, 422 S.W.3d at 53 (drilling of oil and gas well is "project for construction and improvement of real property").

■ The evidence at trial showed that the workers supplied to Gulf Copper by the "labor" subcontractors performed essentially the same activities as Gulf Copper's employees in its yards. Thus, those workers were engaged in activities that resulted in the offshore drilling rigs' (1) obtaining and maintaining the certification requirements imposed by marine classification societies, (2) complying with regulations, both state and federal, applicable to offshore drilling rigs and their operations, and (3) meeting the requirements imposed by contracts entered into between exploration and production companies and the drilling rigs' owners related to specific drilling projects. In our view, it is evident that doing work on offshore drilling rigs—equipment that is undisputedly integral to drilling offshore wells—that renders them able to perform the drilling services required to drill a particular oil well is an activity that is reasonably connected to the construction of that oil well. Thus, at least part of the work done by the subcontractors plainly meets the (g)(3) revenue exclusion's requirement that it be "in connection with" construction of an improvement on real property.

■ Whether performing work that makes a rig compliant with general requirements imposed by marine classification societies or with state and federal regulations generally applicable to offshore drilling rigs and their operations presents a closer question. Arguably, readying an offshore drilling rig for use on offshore drilling projects generally might not be sufficiently related to the "actual or proposed" construction of an improvement to real property to meet the (g)(3) revenue exclusion requirement. Likewise, it could be argued that a drilling rig's compliance with rules and regulations that permit it to operate offshore generally is incidental or tangential to the "actual or proposed" construction of a particular offshore well. We need not, however, address such argu-

ments here because the Comptroller's position is that *all* subcontractor payments were for work too attenuated to qualify for the (g)(3) revenue exclusion by virtue of the work being "two steps" away from the actual drilling of oil wells. The State made no distinctions among the subcontractors' various activities but rather took the position that, as a matter of law, Gulf Copper was not entitled to take the (g)(3) revenue exclusion *at all.* Thus, the State has failed to preserve the argument that while Gulf Copper may have been permitted to claim a (g)(3) revenue exclusion for some of its subcontractor payments, other subcontractor payments were for work too attenuated to an actual or proposed project to qualify. On this record, there is sufficient evidence to support the trial court's conclusion that Gulf Copper was entitled to include the $79,405,230 in payments to subcontractors as flow-through funds falling within the (g)(3) revenue exclusion.

Having concluded that the subcontractor payments qualified for the (g)(3) revenue exclusion, we turn now to Gulf Copper's calculation of its COGS deduction to determine whether the trial court's finding that Gulf Copper was entitled to claim a COGS deduction of $72,711,734 when calculating its margin for franchise tax purposes was supported by factually sufficient evidence.

### Gulf Copper's Calculation of the COGS Deduction

The COGS deduction is calculated in accordance with Texas Tax Code section 171.1012. *See* Tex. Tax Code § 171.1012 (determination of cost of goods sold). Section 171.1012 defines "goods" to mean "real or tangible personal property sold in the ordinary course of business of a taxable entity" and provides that "tangible personal property" does not include services. *Id.* § 171.1012(a)(1), (3)(B)(iii). Section 171.1012 provides that an entity may take a COGS deduction for "all direct costs of acquiring or producing the goods," including labor costs, "costs of materials that are an integral part of" the goods, "handling costs, including costs attributable to processing, assembling, repackaging, and inbound transportation costs," storage costs, and costs of renting, leasing, maintaining, and repairing equipment, facilities, or real property directly used for production of the goods. *Id.* § 171.1012(c).[18] A taxable entity may also take a COGS deduction for post-production direct costs, including storage and handling provided for by subsection (c), and for indirect or administrative overhead costs allocable to the acquisition or production of goods, up to four percent of the entity's total indirect or administrative overhead costs. *Id.* § 171.1012(d), (f).[19] Specifically excluded

---

**18.** Subsection (c) also includes the cost of materials consumed in producing the goods; depreciation, depletion, and amortization associated with and necessary to the production of the goods; research and design activities directly related to the production of the goods; geophysical costs to locate mineral-producing property; taxes paid for materials or services that are direct production costs; the cost of producing or acquiring electricity sold; and "a contribution to a partnership in which the taxable entity owns an interest that is used to fund activities, the costs of which would otherwise be treated as cost of goods sold of the partnership, but only to the extent that those costs are related to goods distribut-

ed to the taxable entity as goods-in-kind in the ordinary course of production activities rather than being sold." Tex. Tax Code § 171.1012(c).

**19.** Subsection (d) also includes insurance for facilities or equipment directly used to produce the goods; insurance on the produced goods; deterioration, obsolescence, spoilage, and abandonment of the goods; pre-production direct costs for property held for future production, including storage and handling provided for by subsection (c); utilities directly used in producing the goods; quality control costs; and licensing or franchise costs. *Id.* § 171.1012(d).

from COGS eligibility are the cost of renting or leasing equipment, facilities, or real property not used for the production of "goods," "selling costs, including employee expenses related to sales," "distribution costs, including outbound transportation costs," and rehandling costs. *Id.* § 171.1012(e). Also excluded are advertising costs, idle facility expenses, bidding costs, interest, income taxes, strike expenses, officer compensation, and compensation paid to undocumented workers. *Id.*

 A COGS deduction is generally available only to the taxable entity that owns the "goods" in question. *Id.* § 171.1012(i). The Legislature has, however, "extended access to the deduction in limited circumstances." *See Hegar v. Sunstate Equip. Co.*, No. 03-15-00738-CV, 2017 WL 279602, at *3 (Tex. App.—Austin Jan. 20, 2017, pet. filed) (mem. op.). Relevant to this case is that "an entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance . . . of real property is considered to be an owner of that labor and materials and may include the costs, as allowed by [section 171.1012], in the cost of goods sold." *Id.* "The analytic framework for determining whether a particular 'labor cost' is includable as a cost of goods sold under subsection 171.1012(i) [ ] requires determining whether the particular activity is an essential and direct component of the 'project for the construction . . . of real property.'" *CGG Veritas*, 2016 WL 1039054, at *3 (citing *Newpark Res.*, 422 S.W.3d at 56). This Court adopted this analytic framework to address the circumstance that (1) the terms "labor" and "service" are not defined in the statute, (2) "services" are specifically excluded from the definition of "tangible personal property," (3) "labor" and "services" are not mutually exclusive, and (4) certain labor expenses associated with activities that might

also be described as a "service" fall within the wide range of labor expenses that section 171.1012(i) permits a taxable entity that furnishes labor to a project for construction or improvement of real property to deduct. *See Newpark Res.*, 422 S.W.3d at 55-57; *see also CGG Veritas*, 2016 WL 1039054, at *3. Thus, provided the activity is "an essential and direct component" of the project for construction or improvement of real property, the associated costs may, through application of subsection 171.1012(i), be included in the COGS deduction even if the activity might be in the nature of a "service." *See Newpark Res.*, 422 S.W.3d at 56 (trial court could reasonably have concluded that removal and disposal of waste material was labor furnished to project for construction of oil and gas well based on trial testimony that this activity was essential to continue drilling of oil and gas well).

In calculating its COGS deduction, Gulf Copper did not engage in a cost-by-cost analysis of each expense to determine whether it fit into one of the categories of costs the statute provides may properly be included in the calculation of cost of goods sold, *see* Tex. Tax Code § 171.1012(c), (d), (f), nor did it employ the analytic framework described above to determine whether its particular activities that involved furnishing labor to a project for construction or improvement of real property (as opposed to its activities that produced "goods") were "an essential and direct component" of a particular project, *see id.* § 171.1012(i). Rather, Gulf Copper took the position that it is a taxable entity "eligible" to take a COGS deduction both because it is the owner of goods (i.e., tangible personal property sold in the ordinary course of its business) and because it furnishes labor and materials for the construction or improvement of real property. Then, relying on subsection 171.1012(h), which provides that "[a] taxable entity

shall determine its cost of goods sold, except as otherwise provided by this section, in accordance with the methods used on the federal income tax return on which the report under this chapter is based," *id.* § 171.1012(h), Gulf Copper used as a "starting point" for its COGS calculation the trial balance (a summary of all transactions for the accounting year) that it used to prepare its federal income tax return. Gulf Copper explained: "When Gulf Copper applied its federal income tax methods to its transactional data (revenues generated and costs incurred), the result represented Gulf Copper's COGS for federal income tax purposes. [ ] For federal income tax purposes, Gulf Copper qualifies a [sic] producer of goods and, thus, must calculate its federal COGS pursuant to the accounting method imposed by Internal Revenue Code Section 236A."[20] From the dollar amount of the COGS deduction it calculated for federal income tax purposes, Gulf Copper excluded costs that it determined constituted costs expressly excluded from the state COGS deduction by subsections 171.1012(e) and (f). *Id.* § 171.1012(e) (list of costs in relation to taxable entity's goods that may not be included in COGS calculation); (f) (taxable entity may include only four percent of taxable entity's total indirect or administrative overhead costs in COGS calculation). Gulf Copper stated that it:

did not parse the costs associated with its integrated business activities because doing so would violate (1) its federal income tax methods; (2) the economic realities of Gulf Copper's business (i.e., it takes all of the activities and their associated costs to generate the taxable revenue); (3) its accounting system (which captures a host of financial data necessary to operate the business but does not segregate its single integrated activity—rig repair—and its costs into component steps); (4) its combined group status; and (5) the Legislature's goal of taxing margin (because diluting Gulf Copper's ability to deduct its costs generates a tax on revenue).

Thus, Gulf Copper's failure to examine, on an item-by-item basis, whether a cost could properly be included in the COGS calculation under the Texas Tax Code was based on (1) its belief that it was required by section 171.1012(h) to start with its federal COGS calculation and (2) the logistical difficulties, given its business model and its accounting systems, of performing that task.

We first consider whether Texas Tax Code subsection 171.1012(h) directs a taxable entity to use its federal income tax COGS deduction as the starting point for its calculation of the Texas franchise tax COGS deduction.[21] Texas Tax Code subsection 171.1012(h) provides:

20. Gulf Copper states that "it appears our Legislature used the corresponding treasury regulation (C.F.R. § 1.236A-1) as an outline to draft the COGS statute."

21. This presents a question of statutory construction that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in construing statutes is to give effect to the Legislature's intent and, ordinarily, " 'the truest manifestation' of what lawmakers intended is what they enacted." *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008) (quoting *Alex Sheshunoff Mgmt. Servs. L.P. v. Johnson*, 209 S.W.3d 644,

651-52 (Tex. 2006)). The language emerging from the legislative process "constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, 'the judge's inquiry is at an end.' " *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013) (quoting *Johnson*, 209 S.W.3d at 651-52). We give an unambiguous statute its plain meaning without resorting to rules of construction or extrinsic aids. *Id.*; *see also Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635, 637 (Tex. 2010) (branding such reliance "improper" because "[w]hen a statute's language is clear

A taxable entity shall determine its cost of goods sold, except as otherwise provided by [section 171.1012], in accordance with the methods used on the federal income tax return on which the report under this chapter is based. This subsection does not affect the type or category of cost of goods sold that may be subtracted under [section 171.1012].

Tex. Tax Code § 171.1012(h). Contrary to Gulf Copper's assertion, this provision does not constitute a directive to use the amount of the taxable entity's federal income tax COGS deduction as a starting point for calculating its state franchise tax COGS deduction and to thereby avoid considering whether each particular cost corresponds to a subtraction from total revenue permitted by section 171.1012. The text of this subsection plainly states that it "*does not affect the type or category* of cost of goods sold that may be subtracted" under section 171.1012. *Id.* (emphasis added).

▮▮▮▮ Thus, the plain language of subsection (h) confirms that a taxable entity is permitted to include in the calculation of its COGS deduction only the types of expenses outlined in subsections 171.1012(c), (d), and (f). Indeed, these subsections are prefaced by subsection (b), which expressly provides that "a taxable entity that elects to subtract cost of goods sold for the purpose of computing its taxable margin *shall* determine the amount of that cost of goods sold *as provided by this section.*" *Id.* § 171.1012(b) (emphases add-

ed). If the Legislature intended for a taxable entity to calculate its state franchise tax COGS deduction by simply subtracting certain expenses from its federal income tax COGS deduction it would not have needed to include the detailed and extensive description of the costs eligible for inclusion in the state COGS deduction that are found in subsections 171.1012(c), (d), and (f). *See id.* § 171.1012(c), (d), (f). Gulf Copper's interpretation of subsection (h) would essentially render subsections (c) and (d) superfluous. While Gulf Copper's interpretation of subsection (h) may have appeal when that subsection is viewed in isolation, well settled rules of statutory interpretation require us to "examine the entire act to glean its meaning" and "to presume that 'the entire statute is intended to be effective.'" *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001) (quoting Tex. Gov't Code § 311.021(2)). And we may not interpret a statute in a way that renders any part of it meaningless. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014).

Under well established rules of statutory interpretation, the proper interpretation of subsection 171.1012(h) is that it speaks to the specific accounting methods the taxable entity uses in determining the amount of its cost of goods sold and mandates that the taxable entity use the same accounting method it used when preparing its federal tax return.[22] A review of the statute as a

---

and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language"). Rules of construction such as agency deference and strict construction of tax statutes against the taxing authority are employed only when a statute is ambiguous. *See TracFone Wireless, Inc. v. Commission on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex. 2013) ("The reach of an *ambiguous* tax statute must be construed 'strictly against the taxing authority

and liberally for the taxpayer.'" (emphasis added) (quoting *Morris v. Houston Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012) (per curiam))).

**22.** An entity's chosen accounting method dictates how the entity's transactions are recorded in its financial books. For example, an entity using the cash-basis accounting method records its expenses in its accounts when it actually pays the cash and books revenues a

whole confirms this conclusion. Subsection 171.1012(b) requires that a taxable entity that elects to subtract cost of goods sold for the purpose of computing its taxable margin "determine *the amount* of that cost of goods sold as provided by [section 171.1012]," whereas subsection (h) requires that a taxable entity "determine its cost of goods sold [ ] *in accordance with the methods* used on the federal income tax return." *Cf.* Tex. Tax Code § 171.1012(b), *with id.* § 171.1012(h). Thus, subsection 171.1012(b) addresses how to calculate the amount of the COGS deduction while subsection (h) clarifies that the taxable entity must use the same accounting method—either cash basis or accrual—when determining whether a particular COGS-deduction-eligible expense should be included in that tax year's COGS calculation.[23]

We also observe that by using its federal income tax COGS deduction as the "starting point," Gulf Copper offered insufficient evidence that the expenses included in that calculation actually correspond to the types and categories of expenses permitted to be included in the calculation of a taxable entity's state franchise tax COGS deduction pursuant to section 171.1012. To the extent the federal COGS calculation includes expenses that are not eligible for the state COGS deduction, such as costs that do not qualify under the state statute as direct costs of "acquiring or producing" the "goods," the result of using that calculation as a starting point is the overinclusion of expenses in the calculation of the COGS deduction for state franchise tax purposes. Gulf Copper's method for calculating its state COGS deduction fails to provide evidence that the expenses included in its starting point (the federal COGS deduction) are deductions that are also permitted to be included in the calculation of the COGS deduction under the state statute.

■ Also unpersuasive is Gulf Copper's argument that its interpretation permits it to avoid the "incredibly burdensome" task of identifying which of the expenses of its integrated business activities actually constitute a cost of "acquiring or producing" a "good" such that it is eligible to be included in the calculation of its COGS deduction. Our interpretation of the Texas Tax Code is not guided by the accounting systems used by taxable entities. *Cf. Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013) (statutory determinations in tax dis-

---

when it actually receives payment. An entity using the accrual accounting method records revenue when the transaction is completed—e.g., when the work specified in a contract between the entity and its customer is completed—instead of when it actually receives payment. The entity handles expenses in the same manner by recording them when they have been incurred rather than when payment is actually made. *See* E. McGruder Faris, Jr., Accounting for Lawyers 75-84 (3d ed. 1975). The cash method and the accrual method are two of the methods a taxpayer may use to compute its taxable income for federal tax purposes. *See* 26 U.S.C. § 446(c) (taxpayer may compute taxable income under cash receipts and disbursement method, accrual method, any other method permitted by statute, or any combination of foregoing methods permitted under regulations prescribed by Secretary of Treasury).

23. The main difference between accrual and cash basis accounting is the timing of when revenue and expenses are recognized. Under the cash method, the taxable entity generally deducts expenses in the tax year in which it actually paid them. Under the accrual method, expenses may be deducted when they are incurred. *See* 26 C.F.R. § 1.466-1 (general rule for methods of accounting). Thus, an expense that might be recognized and included in the COGS deduction calculation in a particular tax year when using the accrual accounting method might not qualify for inclusion in the same tax year when using the cash basis accounting method.

putes should reflect economic realities of *transactions* at issue). The supreme court has explained that it has never suggested that, "in the guise of considering the economic realities or essence of the transaction, courts were authorized to impose an entirely new requirement" that is not found in the language of the tax statute. *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 627 n.8 (Tex. 2013). Rather, we must take the Legislature "at its word and giv[e] the statute its plain meaning." *Id.* at 627. A taxable entity is offered three alternative methods for determining its margin under the Texas franchise tax statute: (1) 70% of total revenue from the entity's total business; (2) subtracting from total revenue the costs of goods sold as determined under section 171.1012; or (3) subtracting from total revenue compensation as determined under section 171.1013. *See* Tex. Tax Code § 171.101(a). Gulf Copper's choice was to subtract from its calculation of total revenue its COGS deduction. The burden on Gulf Copper of calculating the proper amount of that deduction may be an indication that one of the different methods of determining its taxable margin is the better choice. The burden on the entity making the calculation cannot dictate the applicability or the amount of the deduction allowed; we must enforce the statute as written.

The plain language of section 171.1012 confirms that calculating the COGS deduction for Texas franchise tax purposes requires a cost-by-cost analysis to determine whether the cost fits one of the types and categories eligible for inclusion in the calculation. "[T]he Cost of Goods Sold includes 'all direct costs of acquiring or producing goods,' some indirect costs like insurance, utilities, and quality control, and up to 4% of other 'indirect or administrative overhead costs.'" *In re Nestle USA*, 387 S.W.3d at 615 (citations omitted). Because Gulf Copper's calculation of its COGS deduction did not conform to the statute, we reverse the trial court's finding that for report year 2009, Gulf Copper incurred expenses eligible to be included in the cost of goods sold subtraction in the amount of $152,116,964 [24] as lacking factually sufficient evidentiary support.[25] We also reverse the finding that "[t]he categories, classifications, locations and amounts of the costs eligible to be included in the cost of goods subtraction are accurately stated in Exhibit 56."

Our analysis of the COGS deduction issue does not end here, however, because the State likewise presented the trial court with a flawed view of what qualifies for inclusion in Gulf Copper's calculation of its COGS deduction, as explained below.

### The Comptroller's Calculation of Gulf Copper's COGS Deduction

The Comptroller performed its own calculation of Gulf Copper's COGS deduction as follows. First, the Comptroller determined that Gulf Copper had no expenses that qualified for the COGS deduction by virtue of subsection 171.1012(i). That is, it concluded that none of Gulf Copper's costs were associated with labor and materials

---

24. This number assumes that the subcontractor payments are not excluded from total revenue but, instead, are included in the COGS deduction.

25. Although the State did not frame its appellate issue as a factual sufficiency challenge, the Comptroller has acknowledged that Gulf Copper is entitled to take a COGS deduction of some amount. The State requested that, in the event this Court does not accept the Comptroller's method of calculating Gulf Copper's COGS deduction, we remand the case to the trial court for further proceedings to determine Gulf Copper's COGS deduction by application of a proper interpretation of section 171.1012 to the evidence before the trial court.

"furnished to a project for the construction, improvement, remodeling, repair, or industrial maintenance of real property." *See* Tex. Tax Code § 171.1012(i). Thus, the Comptroller did not consider whether any of Gulf Copper's costs were for labor and materials furnished to a qualifying project or were associated with activities that might otherwise be viewed as "services" but might nevertheless be eligible for inclusion in the COGS deduction calculation because they were an "essential and direct component of the 'project for construction ... of real property.'" *See id.*; *CGG Veritas*, 2016 WL 1039054, at *3; *Newpark Res.*, 422 S.W.3d at 56. Next, the Comptroller determined that only activities involving "fabrication" of items sold to Gulf Copper's customers should be included in the COGS calculation. Because Gulf Copper's accounting records did not differentiate between the costs of what the Comptroller deemed to be "fabrication" and what it deemed to be simply "installation" or other non-production related activities,[26] the Comptroller decided to use Gulf Copper's labor records as a proxy for all of its costs and asked Gulf Copper to review its labor costs to come up with a percentage to apply to each of Gulf Copper's facilities that would represent the percentage of its costs that were related to "fabrication."

The Comptroller assigned the following percentages for each of Gulf Copper's facilities: (1) 50% at Port Arthur, (2) 50% at Galveston, and (3) 5% at Corpus Christi. The Comptroller then reviewed each type of Gulf Copper's expenses for each facility and, if the Comptroller concluded that the type of expense was one that was generally eligible for inclusion in the COGS calculation it allowed it on the percentage basis assigned to the facility where the activity generating the expense occurred. For example, the Comptroller allowed 50% of the labor costs associated with the Port Arthur facility because labor is identified in subsection 171.1012(c) as a cost of goods sold, but only to the extent it is a direct cost of acquiring or producing a good. Having determined that 50% of the Port Arthur yard activities were "fabrication," the Comptroller determined that 50% of the labor costs at that facility were a direct cost of producing a good. The Comptroller analyzed all of Gulf Copper's expenses in this general manner unless it was apparent that the expense was entirely related to producing goods, such as cost of materials. The Comptroller did not allow any of the costs incurred by Sabine Surveyors because it determined that this entity performed only services.[27]

26. The Legislature recently amended the definition of "production" contained in Texas Tax Code section 171.1012(a). *See* Act of May 19, 2017, 85th Leg., R.S., ch. 377, § 1, 2017 Tex. Sess. Law Serv. ch. 377 (to be codified as an amendment to Tex. Tax Code § 171.1012(a)(2)). The amendment provides that, effective September 1, 2017, " 'production' means construction, manufacture, development, mining, extraction, improvement, creation, raising, or growth." *Id.* The pre-amendment definition provides that production "includes construction, installation, manufacture, development, mining, extraction, improvement, creation, raising, or growth." The amended version replaces the word "includes" with the word "means" and eliminates "installation" from the definition of "production." The Legislature's note to the amendment states that the amendment "is a clarification of existing law and does not imply that Section 171.1012, Tax Code, before the amendment made by this Act may be construed as inconsistent with Section 171.1012, Tax Code, as amended by this Act." Act of May 19, 2017, 85th Leg., R.S., ch. 377, § 2, 2107 Tex. Sess. Law Serv. ch. 377.

27. Implicit in the 0% assigned to Sabine Surveyors is the Comptroller's determination that none of its costs could be included in Gulf Copper's COGS calculation by virtue of subsection 171.1012(i).

The trial court concluded that "[t]he limitations imposed by the Comptroller upon Gulf Copper's cost of goods sold calculation violate Tex. Tax Code § 171.1012." We agree. The Comptroller's calculation of Gulf Copper's COGS deduction is inconsonant with section 171.1012 in two ways. First, we do not agree with the Comptroller that none of Gulf Copper's expenses qualify for inclusion in its COGS calculation by virtue of subsection 171.1012(i). For example, Gulf Copper presented evidence at trial that, to some extent, Gulf Copper's employees provided labor and materials to projects for improvement of real property (drilling oil wells). The Comptroller was obligated to consider to what extent the activities of Gulf Copper's employees were essential and direct components of those specific projects. *See CGG Veritas*, 2016 WL 1039054, at *3. Sabine Surveyors also performed activities that, while constituting activities that might be described as a "service," are an "essential and direct component" of a project for construction of real property. Such activities include conducting surveys of rigs in order to ensure compliance with requirements specific to a particular drilling project. Other of Sabine Surveyors' activities, such as performing vessel surveys for underwriters, might be so attenuated that the costs of those activities would not constitute the cost of furnishing labor and materials *to* a project. Sabine Surveyors' costs should have been analyzed on a cost-by-cost basis to determine which of those costs met the requirement that they be integral, essential, and direct components of the offshore drilling process and which might be "too far removed from the construction, improvement, remodeling, repair, or industrial maintenance of real property to qualify for the cost-of-goods-sold deduction under section 171.1012(i)." *Newpark Res.*, 422 S.W.3d at 57.

Second, the Comptroller did not calculate the COGS deduction using a cost-by-cost analysis but, rather, developed percentages that it then applied to disallow and remove certain costs from the COGS deduction. This methodology is contrary to the cost-by-cost analysis required to determine whether a certain cost fits into a type or category identified in section 171.1012. The Comptroller's percentages were derived by using labor costs as a proxy for other costs and, consequently, there is an insufficient basis for the Comptroller's allocation of costs as deductible direct costs of producing goods.

Applying a proper construction of section 171.1012, the trial court's findings that Gulf Copper was entitled to include the entire $152,116,964 amount of its costs in the calculation of its COGS deduction is erroneous as a matter of law. Gulf Copper did, however, present some evidence, and the Comptroller does not dispute, that it was entitled to take a COGS deduction and exclude from its taxable margin a significant amount of its costs. The trial court correctly found that the limitations the Comptroller placed on Gulf Copper's cost of goods sold calculation were contrary to section 171.1012 for the reasons stated above. The Comptroller's calculation may not serve as the basis for determining Gulf Copper's taxable margin or, consequently, the amount of any refund to which it may be entitled. Further proceedings are therefore required to correctly calculate Gulf Copper's COGS deduction.

## CONCLUSION

For the reasons stated in this opinion, we conclude that, on this record, Gulf Copper was entitled to include the entire $79,405,230 of subcontractor payments in its (g)(3) revenue exclusion. We also conclude that (1) factually insufficient evidence supports the trial court's finding

that Gulf Copper was entitled to include the entire $152,116,964 of its costs in its COGS deduction and (2) the Comptroller's calculation of that deduction is incorrect as a matter of law. Consequently, we reverse the trial court's judgment ordering the State to pay Gulf Copper the full amount it paid under protest and remand the cause to the trial court for further proceedings to determine the exact amount of refund to which Gulf Copper is entitled.