# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00315-CV

**U.S. Concrete, Inc., Appellant**

**v.**

**Glenn Hegar, Comptroller of Public Accounts, State of Texas; and
Ken Paxton, Attorney General of Texas, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-14-004938, HONORABLE JAN SOIFER, JUDGE PRESIDING**

## O P I N I O N

In this franchise tax protest suit, U.S. Concrete, Inc., appeals from the district court's final judgment in favor of Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas. *See* Tex. Gov't Code §§ 403.201–.221 (governing suits by persons owing taxes or fees); Tex. Tax Code §§ 112.001–.156 (governing taxpayers' suits). U.S. Concrete manufactures ready-mixed concrete using mixer-trucks. U.S. Concrete is also subject to the franchise tax, and in 2008 and 2009, it calculated its franchise tax by subtracting as cost of goods sold (COGS) all of its costs relating to its mixer-trucks, their drivers, and the dispatchers who oversee the orders for ready-mixed concrete. After an audit, the Comptroller determined that U.S. Concrete was not entitled to subtract all of its costs for the mixer-trucks and drivers and that the costs for dispatchers were subject to a 4% cap as an indirect or administrative overhead costs. The Comptroller maintained this position in an administrative proceeding. Having

lost its administrative challenge, U.S. Concrete sued the Comptroller in district court seeking a refund "in full" of the taxes paid under protest. *See* Tex. Tax Code § 112.054 (providing for trial de novo); Tex. Gov't Code § 403.205 (same). Following a bench trial, the district court issued a judgment that U.S. Concrete take nothing and entered findings of fact and conclusions of law in support of the judgment. On appeal, U.S. Concrete asserts that (1) the district court erred in upholding the Comptroller's decision to disallow 70% of U.S. Concrete's mixer-truck costs and 41% of its truck-operator labor costs on the ground that these costs did not qualify as COGS, (2) the district court erred in concluding that U.S. Concrete's dispatcher costs were subject to a 4% cap as indirect or administrative overhead costs, and (3) the district court erred in imposing a higher burden of proof on U.S. Concrete because the statute is unambiguous and the COGS calculation is neither a deduction nor an exemption. We will affirm the district court's judgment.

**Franchise Tax**

This Court has on several occasions summarized the current Texas franchise-tax scheme, enacted in 2006. *See Hegar v. Gulf Copper & Mfg. Corp.*, 535 S.W.3d 1, 4 (Tex. App.—Austin 2017, pet. filed); *Titan Transp., LP v. Combs*, 433 S.W.3d 625, 627–29 (Tex. App.—Austin 2014, pet. denied); *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47–48 (Tex. App.—Austin 2013, no pet.). The franchise-tax statute has been substantively amended several times since its enactment, and the provisions applicable to this case are those that were in effect in 2008 and 2009.[1] Under the current scheme, chapter 171 of the Tax Code imposes a franchise tax on

---

[1] Citations in this opinion are to the current version of the Tax Code when intervening amendments are not relevant to the disposition of the issues on appeal.

2

a taxable entity that does business or is chartered or organized in Texas.  Tex. Tax. Code § 171.001(a).

The tax is applied to the entity's "taxable margin."  *Id.* § 171.002(a).  The entity computes its taxable

margin by first determining its "margin."  *Id.* § 171.101(a)(1).  In the years relevant to this suit, the

"margin" was defined as the lesser of (1) 70% of the taxable entity's total revenue or (2) the taxable

entity's total revenue minus, at the entity's election, either the cost of goods sold, as determined

under section 171.1012 (the COGS calculation), or compensation, as determined under section

171.1013 (the compensation calculation).[2]  *Id.; see In re Nestle USA, Inc.*, 387 S.W.3d 610, 615

(Tex. 2012) (orig. proceeding) (showing formula for calculating franchise tax, including margin);

*Gulf Copper*, 535 S.W.3d at 4 (noting that this Court has provided overviews of the franchise tax

scheme and describing the franchise tax calculation).  After applicable deductions have been taken,

"taxable margin" is determined by apportioning the adjusted revenue between in-state and

out-of-state business and, except for E-Z computation filers, subtracting any other allowable

deductions.  Tex. Tax Code §§ 171.101(a)(2), (3), .1016(b)(2), (c).  The franchise-tax obligation is

determined by multiplying the "taxable margin" by the applicable tax rate.  *Id.* § 171.002.

   An entity that opts to subtract its cost of goods sold is guided by section 171.1012 of

the Tax Code, which provides that the "cost of goods sold includes all direct costs of acquiring or

producing the goods" and lists examples of costs that may be subtracted as COGS.  *Id.* § 171.1012(c).

The statute also expressly lists fourteen categories of costs that may not be subtracted as COGS.

---

[2] The current version of the statute also provides an option for the taxable entity to determine its taxable margin by subtracting one million dollars from its total revenue, but this provision was added in 2013 and is not at issue here.  Act of May 27, 2013, 83d Leg., R.S., ch. 1232, § 6, 2013 Tex. Gen. Laws 3104, 3106 (eff. Jan. 1, 2014).

*Id.* § 171.1012(e). In addition, the statute allows a taxable entity to subtract as COGS indirect or administrative overhead costs but limits the amount subtracted to 4% of those costs. *Id.* § 171.1012(f).

**Standards of Review**

Whether U.S. Concrete's mixer-truck costs, driver costs, and dispatcher costs are COGS presents a question of statutory construction that we review de novo. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008). Our primary concern in construing a statute is the express statutory language. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 867 (Tex. 2009). "We thus construe the text according to its plain and common meaning unless a contrary intention is apparent from the context or unless such a construction leads to absurd results." *Presidio Indep. Sch. Dist. v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010) (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)). We "read the statute as a whole and interpret it to give effect to every part." *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003)). "The language emerging from the legislative process 'constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, the judge's inquiry is at an end.'" *Gulf Copper*, 535 S.W.3d at 15 n.21 (quoting *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013) (internal quotations omitted)). We give an unambiguous statute its plain meaning without resorting to rules of construction or extrinsic aids. *Id.* "Taxing statutes are construed strictly against the taxing authority and liberally for the taxpayer." *Morris v. Houston Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012).

4

U.S. Concrete also challenges the district court's findings of fact and conclusions of law. We review findings of fact for legal and factual sufficiency of the evidence by the same standard applied to a jury verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005) (describing the legal sufficiency standard of review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (describing the factual sufficiency standard of review). We review conclusions of law de novo to determine their correctness and will uphold conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Further "we will not reverse an erroneous conclusion if the trial court rendered the proper judgment." *City of Austin v. Whittington*, 384 S.W.3d 766, 779 n.10 (Tex. 2012); *see BMC Software*, 83 S.W.3d at 794.

**U.S. Concrete's Business**

U.S. Concrete manufactures and delivers ready-mixed concrete in an unhardened plastic state to customers who will then place and shape it into designed forms and cure it at each job site. U.S. Concrete owns several batch plants where ingredients for concrete and mixer trucks are stationed. Using what is called the "transit method," U.S. Concrete manufactures and transports ready-mixed concrete in mixer-trucks, which consist of a truck chassis with an attached mixing drum. When a customer calls one of U.S. Concrete's dispatchers, the dispatcher determines which batch plant should fulfill the order based on the customer's delivery location, date, and time. On the date of delivery, the order is assigned to a U.S. Concrete truck driver, who inspects the mixer-truck, then loads materials into the drum to mix the concrete at "mixing speed." The driver then checks

5

the consistency, or "slump," of the concrete before slowing the drum to "agitate speed" and driving to the delivery site. Keeping the drum rotating prevents the mixture from settling while in transit. Once at the site, the driver inspects the concrete, makes any needed adjustments to it, and unloads it from the drum using a chute. After that, the driver will wash down the truck and either deliver remaining concrete to a different job site or return any remaining concrete to the plant. Until it is washed out, the drum is kept rotating because it is not completely empty of concrete.

**U.S. Concrete's Mixer-Trucks and Drivers**

For tax years 2008 and 2009, U.S. Concrete subtracted as cost of goods sold all of its costs relating to its mixer-trucks and their drivers. In support of its assertion that 100% of its costs for the mixer-trucks and drivers were properly included in the COGS subtraction, U.S. Concrete essentially argues that because the mixer-truck's drum rotates constantly (whether at mixing speed or agitate speed) while the unhardened concrete is in it, the manufacturing process is ongoing, such that everything that happens with the truck or its driver is part of the manufacturing process, and every cost of the mixer-truck and driver may be subtracted as COGS, from the moment (or perhaps even before) the raw materials are added to the mixer-truck's drum until the time the concrete is poured at the job site, and possibly until the truck is washed out and parked. U.S. Concrete specifically asserts that (1) 100% of the driver and mixer-truck costs are costs of manufacturing, (2) the primary purpose of the mixer-trucks and drivers is manufacturing, while any distribution or rehandling costs are merely incidental, and (3) the Comptroller's allocations between costs that are and are not COGS are fatally arbitrary. The Comptroller's position is that 70% of U.S. Concrete's costs related to the mixer-truck and 41% of the costs related to the drivers are actually distribution

6

costs or rehandling costs, not COGS. Section 171.1012(e) of the Tax Code prohibits a taxable entity from subtracting as COGS "distribution costs, including outbound transportation costs," and "rehandling costs" that are "in relation to the taxable entity's goods," so if the Comptroller is correct, then U.S. Concrete was not entitled to a COGS subtraction for these costs. *Id.*

### *Ready-mixed concrete is a good*

As a preliminary matter, U.S. Concrete contends that ready-mixed concrete isn't a "good" until it is discharged at a job site. U.S. Concrete reasons that because the concrete is agitated in a mixer-truck's drum, it is constantly being manufactured, it is not yet a "good," and therefore U.S. Concrete has no distribution costs in relation to a "good." However, U.S. Concrete contends that the concrete, upon being poured, becomes a good because that is the form of concrete U.S. Concrete sells to customers. U.S. Concrete's executive vice-president testified that U.S. Concrete's sale of unhardened concrete ends at the point of discharge, but he further explained that after that, the concrete is shaped and cured for several weeks. The shaped concrete is tested for strength after twenty-eight days, and will continue to cure and strengthen for several more weeks after that. He testified that, as a result, the manufacturing cycle of concrete is not completed until long after U.S. Concrete has sold the unhardened concrete to the customer. If U.S. Concrete were correct that the concrete is not a good until the manufacturing process is complete, then the testimony of U.S. Concrete's executive vice-president suggests that U.S. Concrete does not sell a good at all. If that is not U.S. Concrete's argument, then the argument would seem to be that unhardened concrete becomes a "good" based on when U.S. Concrete delivers it. Neither the manufacturing process nor the point of sale are mentioned in the statute's definition of "goods." Section 171.1012 provides

7

that "'Goods' means real or tangible personal property sold in the ordinary course of business of a taxable entity," and it generally defines tangible personal property as "personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner." *Id.* § 171.1012(a)(1), (3). Concrete in an unhardened plastic state carried inside a mixer-truck drum is personal property that can be seen, weighed, measured, felt, touched, and perhaps otherwise perceived by the senses, and it is sold by U.S. Concrete in the ordinary course of business. We reject the argument that unhardened concrete becomes a good only upon being poured from the truck at a job site.

### U.S. Concrete's mixer-truck and driver costs

In its first issue, U.S. Concrete asserts that 100% of its mixer-truck and driver costs are attributable to manufacturing because U.S. Concrete has no distribution or rehandling costs whatsoever. U.S. Concrete urges that mixer-trucks are plants on wheels that have no purpose other than to manufacture ready-mixed concrete. As such, it claims, all costs related to the mixer-trucks and drivers should be subtracted from its total revenue as COGS. U.S. Concrete therefore challenges the factual and legal sufficiency of the following findings of fact and conclusions of law made by the district court:

**Findings of Fact:**

6. Portions of U.S. Concrete's trucks do not produce ready-mixed concrete.

9. U.S. Concrete employs truck drivers who perform manufacturing and transportation roles.

8

10. U.S. Concrete's truck drivers spend a portion of their time manufacturing ready-mixed concrete.

12. U.S. Concrete's truck drivers are not manufacturing ready-mixed concrete during the time that they are driving the trucks.

14. U.S. Concrete's truck and truck driver costs are, in part, costs of delivering ready-mixed concrete.

**Conclusions of Law:**

2. Some of U.S. Concrete's truck costs are not costs of producing ready-mixed concrete, and thus may not be included in its cost-of-goods-sold deduction under § 171.1012 of the Texas Tax Code.

3. Some of U.S. Concrete's labor costs for its drivers are not costs of producing ready-mixed concrete, and thus may not be included in its cost-of-goods-sold deduction.

4. Some of U.S. Concrete's truck costs are transportation costs that are specifically excluded from the cost-of-goods-sold deduction under Texas Tax Code §171.1012(e).

5. Some of U.S. Concrete's labor costs for its drivers are transportation costs that are specifically excluded from the cost-of-goods-sold deduction under Texas Tax Code § 171.1012(e).

8. Under Texas Tax Code § 171.1012(c), U.S. Concrete may only include in its cost-of-goods-sold deduction: truck depreciation, repairs, and fuel costs properly allocable to the production of ready-mixed concrete.

9. Under Texas Tax Code § 171.1012(c) and 34 Tex. Admin. Code§ 3.588(d)(1), U.S. Concrete may only include in its cost-of-goods-sold deduction: driver labor costs properly allocable to the acquisition or production of ready-mixed concrete.

10. U.S. Concrete did not meet its burden of proving that it is entitled to 100% of its claimed cost-of-goods-sold deduction.

As to the mixer-trucks, U.S. Concrete states that this Court's decision in *American Multi-Cinema, Inc. v. Hegar*, No. 03-14-00397-CV, 2017 Tex. App. LEXIS 85, at *1–2, *9–10

(Tex. App.—Austin Jan. 6, 2017, pet. filed) (mem. op.), squarely rejected the argument that a movie theater auditorium could be divided into parts, some of which were COGS and some of which were not, when the evidence showed that all parts of the auditorium worked together to produce films. Although in *American Multi-Cinema* the Comptroller argued that only costs associated with the auditorium's square footage dedicated to screens and speakers should be included as COGS, this Court rendered a judgment that included the square footage of the entire auditorium as COGS because the taxpayer had presented evidence that the entire auditorium was directly used for production of the good. *Id.* at *26. Although the Comptroller asserted that parts of the auditorium not used for screens and sound were not part of the production of the good, he failed to produce any evidence to controvert the facts established by the record. *Id.* The Comptroller instead tried to argue facts based on "the common experience of moviegoers" but failed to present or elicit any evidence of this assertion. *Id.* at *23–25. By contrast, the record in this case contains evidence supporting a distinction between costs that U.S. Concrete incurs related to its trucks' manufacturing and transportation costs.

The Comptroller agrees that mixer-trucks manufacture concrete at the batch plant and that some manufacturing occurs at the job site, but takes the position that while the mixer-trucks are agitating the concrete to preserve its state of suspension while in transit, the unhardened concrete is being preserved and transported, not manufactured. The record shows that mixer-trucks are made of two components: the chassis and the drum, which are purchased separately, then shipped to the buyer (here, U.S. Concrete) as one unit. All of the parts of the truck that propel it down the road are included in the chassis. The trucks have a fuel gauge that measures, for motor fuel tax purposes, how much fuel is used for the chassis (which propels the entire vehicle) and how much is used for

10

the drum. Testimony and documents show that to mix the concrete, generally the raw materials would be poured into the drum, then mixed by spinning the drum seventy rotations at "mixing" speed, and then the speed would be slowed to agitate speed while in transit. Unless there was an unexpected traffic condition or other delay in reaching the job site, nothing else (other than being agitated to prevent settling) would be done to the unhardened concrete until the mixer truck arrived at the delivery site. Once on the site, the concrete's slump might or might not need to be adjusted, the drum would be spun for thirty rotations at mixing speed, and the concrete would be poured out of the truck's chute. Barring exceptional circumstances, the only thing the mixer-truck would do to the concrete while in transit is turn it at agitate speed to keep it from settling, and the driver, while driving, would check to make sure the drum continued rotating. If an adjustment to the composition of the concrete or the speed of the drum were necessary before reaching a delivery site, the driver would be expected to pull over to make the adjustment but would not adjust the mixture while moving down the road. Based on the evidence in the record, the district court did not err in finding that portions of the mixer-trucks do not produce ready-mixed concrete and that some of the mixer-truck costs are delivery or outbound transportation costs, which the district court correctly concluded cannot be subtracted as COGS under Tax Code section 171.1012(e). The district court therefore also correctly concluded that, under the statute, only those truck costs allocable to producing ready-mixed concrete could be included as COGS.

The record also reflects that the drivers thoroughly inspect the mixer-trucks for any defects before use, including checking the windshield wipers, "steering free play," fluid levels, the heater and defroster, the mirrors, and the horn. Then they help to load raw materials into the mixer trucks' drums, operate the drum to make it mix the concrete, check the slump of the concrete and

11

adjust it depending on customer specifications, wash the exterior of the truck, drive the mixer trucks to the delivery sites, pour the concrete out of the truck using the truck's chute, wash the mixer-truck's exterior components, and drive the truck to another delivery site or back to the batch plant to remove the rest of the concrete from the drum. Between sixty and eighty percent of the drivers' time is spent in the cab of the truck. The trucks are equipped with GPS that can track the drivers' driving time. While driving, the drivers are responsible for observing all traffic laws. Drivers are expected to stop driving to make any adjustments to the unhardened concrete. The drivers' essential job duties include "Driv[ing] truck from yard to job sites," and "Position[ing] truck to offload concrete." U.S. Concrete contends that every portion of its drivers' activities constitutes manufacturing because, even while driving, the drivers are constantly monitoring the concrete in the drum and are in contact with dispatchers at the plant, who might reroute them based on traffic conditions or other information. However, based on the evidence in the record, we conclude that the district court did not err in finding that U.S. Concrete's drivers perform transportation roles, that they spend a portion of their time manufacturing ready-mixed concrete, that they are not manufacturing ready-mixed concrete while they are driving the mixer-trucks, and that some of the driver costs are costs of delivery. Nor did the district court err in concluding that because some of the drivers' time is spent on transporting rather than producing concrete, the corresponding labor costs may not be included in the COGS deduction. *See* Tex. Tax Code § 171.1012(e) (excluding costs for delivery, including outbound transportation, in relation to a good). The district court also correctly concluded that, under the statute and corresponding administrative rule, only those driver labor costs allocable to acquisition or production of ready-mixed concrete could be included as COGS. *See id.* § 171.1012(c) (listing direct costs that may be included as COGS); 34 Tex. Admin.

12

Code § 3.588(d)(1) (Comptroller of Public Accounts, Margin: Cost of Goods Sold) (allowing direct labor costs to be included as COGS).

### Primary purpose test

In the event that any of U.S. Concrete's driver and mixer-truck costs were considered to be costs of distribution, U.S. Concrete urges that this Court should apply a "primary purpose" test for purposes of the COGS subtraction and allocate all costs relating to drivers and mixer-trucks to manufacturing because the primary purpose of these costs was manufacturing. We must decline the invitation to apply a primary purpose test in this case because the statute itself defines which costs may be included in the COGS subtraction, *see* Tex. Tax Code § 171.1012(c), and which costs must be excluded, *see id.* § 171.1012(e). The franchise tax statute disallows distribution costs in relation to a taxable entity's goods from being included as COGS, regardless of the primary purpose for which the costs were incurred. *See id.* § 171.1012.

### The Comptroller's COGS determinations

Even if the district court correctly determined that some of the driver and mixer-truck costs are not COGS, U.S. Concrete asserts that the case should nonetheless be remanded for further proceedings because the Comptroller's allocations are fatally arbitrary. In her audit, the Comptroller's auditor looked at the categories of costs provided by U.S. Concrete and determined that certain categories of costs, such as those related to maintenance of the trucks' chasses or certain of the drivers' duties, including the time they spent driving to deliver the concrete, were not allowable as COGS. Initially, she determined that 15% of U.S. Concrete's claimed labor costs and 30% of the mixer-truck costs were allowable as COGS. While the amount allowable for the trucks remained

13

constant—the auditor consistently maintained the position that 70% of mixer-truck costs allocable to "Repairs–delivery" and "truck repairs, fuel, depr[eciation]" could not be subtracted as COGS—the auditor increased the amount of labor costs allowable as COGS to 43% and then to 59% after consultation with U.S. Concrete. Her testimony reflects that she performed a calculation based on information provided by U.S. Concrete by first determining which of the listed job duties and expenses belonged to allowable categories of costs and which belonged to prohibited categories of costs under the COGS statutes and accompanying administrative rules. Then "[she] did the math" to determine that 43% of the drivers' labor costs and 30% of the mixer-truck costs should be allowed as COGS. According to U.S. Concrete's protest letter, the auditor increased the allowable driver labor costs to 59% in her "final calculation based on her site visit to a U.S. Concrete facility and a customer's point of sale." Although the audit reports supporting the auditors first two sets of determinations are in the record, the record does not fully explain the basis for increasing U.S. Concrete's driver costs that may be included as COGS to 59%. We further note that several exhibits are absent from the record on appeal, including Exhibit 7, which, according to other information in the record, contains the auditor's calculations relating to the allowable COGS amounts. In the absence of this information in the appellate record, U.S. Concrete argues that we must remand to the district court for further proceedings to determine the proper allocations.

In oral argument, U.S. Concrete referred to our recent opinion in *Gulf Copper*, where we remanded a case to the trial court to determine the proper calculation of the COGS subtraction, as an example of the correct way to treat the current case. *See Gulf Copper*, 535 S.W.3d at 14–21 (describing how each of the parties erroneously calculated Gulf Copper's COGS deduction). In *Gulf Copper*, appellee Gulf Copper had calculated its COGS subtraction by using its federal income

14

tax COGS deduction as a "starting point" for calculating its Texas franchise tax COGS subtraction, without following the Texas Tax Code's directive to determine its COGS by examining "on an item-by-item basis, whether a cost could be properly included in the COGS calculation under the Texas Tax Code." *Id.* at 15. The Comptroller, while trying to reach the correct amount for Gulf Copper's COGS subtraction, "likewise presented the trial court with a flawed view" of what qualified as COGS. *Id.* at 18. The trial court concluded that the Comptroller's method, which disallowed costs that this Court determined could be included as COGS, violated section 171.1012 of the Tax Code, and this Court agreed. *Id.* at 20. Like Gulf Copper, the Comptroller failed to "calculate the COGS deduction using a cost-by-cost analysis but, rather, developed percentages that it then applied to disallow and remove certain costs from the COGS deduction." *Id.* Unlike the allocations in *Gulf Copper*, where the Comptroller used percentages derived by using labor costs as a proxy for other costs, the auditor here reached her percentages by examining categories of costs provided by U.S. Concrete and determining whether each of those types of costs could be included as COGS. For example, the auditor's testimony reflects that she allocated the driver labor costs based on the drivers' job duties as described in the documents she received from U.S. Concrete. She later updated the amounts credited to manufacturing by giving more items credit for being part of the manufacturing process; a higher percentage allowed for driver costs resulted from that. Her allocation for the mixer-truck costs are shown in the audit reports to be based on excluding costs allocable to "Repairs–delivery" and "truck repairs, fuel, depr[eciation]." Thus, the record indicates that the Comptroller followed the statute's prescribed cost-by-cost methodology.

As the plaintiff in a tax protest suit, U.S. Concrete had the burden in the district court to show by a preponderance of the evidence that it was entitled to a refund. *See GATX Terminals*

15

*Corp. v. Rylander*, 78 S.W.3d 630, 634 (Tex. App.—Austin 2002, no pet.) ("A taxpayer who sues for a tax refund after an administrative hearing, then, is like a plaintiff in any other cause of action, and hence carries the burden to establish its eligibility to a refund.") (citing *Key W. Life Ins. Co. v. State Bd. of Ins.*, 350 S.W.2d 839, 846 (Tex. 1961); *Attorney Gen. v. Orr*, 989 S.W.2d 464, 467 (Tex. App.—Austin 1999, no pet.)). It was required to produce and maintain records to enable verification of its claim relating to the amount of the tax that will be refunded. Tex. Tax Code §112.052(d); Tex. Gov't Code § 403.202; *see* Tex. Tax Code § 111.0041 (regarding records and the burden to substantiate claims). In its protest letter, U.S. Concrete was required to "state fully and in detail each reason for recovering the payment," Tex. Tax Code § 112.051(b), Tex. Gov't Code § 403.202(b), and any issues to be determined in its lawsuit "are limited to those arising from the reasons expressed in the written protest as originally filed," Tex. Tax Code § 112.053(b); Tex. Gov't Code § 403.204(b). In its protest letter and at every stage of this suit thereafter, U.S. Concrete's sole argument was that it is entitled to 100% of its driver labor costs and mixer-truck costs. It offered no alternative position, thereby failing to have "detail[ed] each reason for recovering the payment."[3] Tex. Tax Code § 112.053(b); Tex. Gov't Code § 403.204(b). U.S. Concrete did not meet its burden of showing by a preponderance of the evidence that it is entitled to a refund. Although it argues that the Comptroller's percentages are arbitrary, the record shows that the auditor

---

[3] U.S. Concrete asserted that the auditor's allocations were arbitrary and conclusory, but offered no evidence to support those assertions. Instead, U.S. Concrete appears to argue that the numbers were arbitrary and conclusory because they failed to include the entire amount of the mixer-truck and driver costs as COGS. On appeal, U.S. Concrete challenges in three brief footnotes, without citing evidence in the record, the district court's finding of fact that "U.S. Concrete provided no credible evidence challenging the Comptroller's allocation." Because U.S. Concrete did not support its challenge to the Comptroller's allocations with credible evidence, the district court did not err in making this finding of fact.

16

followed the cost-by-cost methodology, even though some of her actual calculations have been omitted from the record on appeal.[4]  On this record, we cannot hold that the district court erred in concluding that "U.S. Concrete did not meet its burden of proving that it is entitled to 100% of its claimed cost-of-goods-sold deduction."  We overrule U.S. Concrete's first issue.

**U.S. Concrete's Dispatchers**

In its second issue, U.S. Concrete argues that the district court erred in finding that its dispatchers do not directly manufacture ready-mixed concrete.  It is undisputed that U.S. Concrete's dispatchers take customer orders, enter the orders into the computer, and provide support to the drivers.  The dispatcher may inform drivers of major traffic events that might impact delivery or direct them to deliver to another site or return to the batch plant after a delivery.  U.S. Concrete contends the district court erred in finding that the dispatchers do not directly manufacture ready-mixed concrete.  Under Tax Code section 171.1012(f):

> A taxable entity may subtract as a cost of goods sold indirect or administrative overhead costs, including all mixed service costs, such as security services, legal services, data processing services, accounting services, personnel operations, and general financial planning and financial management costs, that it can demonstrate are allocable to the acquisition or production of goods, except that the amount subtracted may not exceed four percent of the taxable entity's total indirect or administrative overhead costs, including all mixed service costs.

---

[4] In oral argument, counsel for the Comptroller opined that this Court should not remand to the district court to determine the proper amount of U.S. Concrete's COGS subtraction because U.S. Concrete failed to present any alternative numbers in its protest letter.  However, counsel for the Comptroller later acknowledged that the record contains evidence of how the auditor reached her allocations, even though the actual calculation is absent from the record.  Had the record not reflected that the Comptroller satisfied the statute's cost-by-cost-analysis requirement, a remand might have been appropriate.

17

Because the Comptroller has agreed that the dispatchers are involved in the manufacturing process, the sole question is whether the dispatcher's role of communicating with the drivers and customers is direct or indirect manufacturing. In questioning the regional vice president for U.S. Concrete South Central region and general manager for Redi-Mix, the Comptroller elicited testimony that the dispatchers take the customers' orders and then direct the trucks to the customers. Although taking orders from customers might be considered sales, the cost of which is prohibited from being included in COGS, the Comptroller concedes that all of the dispatcher costs can be included as indirect manufacturing costs, so the issue of whether any of the dispatcher costs are excluded as costs of sales is not before us. *See* Tex. Tax Code § 171.1012(e)(2). However, the fact that the dispatchers take customers' orders is some evidence that at least some of what they do is not direct manufacturing under the statute. Regarding the dispatchers, the Comptroller also asked, "But they don't do production. They talk to customers and drivers, is what they do, right?" The regional vice president responded, "That's correct." Accordingly, the evidence in the record supports the district court's finding that U.S. Concrete's dispatchers do not directly manufacture ready-mixed concrete. We overrule U.S. Concrete's second issue.

**The District Court's Standard of Review**

In its third issue, U.S. Concrete asserts that the district court impermissibly applied a heightened standard of review when it found that "U.S. Concrete did not meet its burden of proving that it is entitled to 100% of its claimed cost-of-goods-sold deduction." Judicial review before the trial court in a tax protest suit by the taxpayer is de novo. *Id.* § 112.054. Therefore, the reviewing court was required to "try each issue of fact and law in the manner that applies to other civil suits

in this state as though there had not been an intervening agency action or decision." Tex. Gov't Code § 2001.173. As a result, a taxpayer bringing a protest suit "is like a plaintiff in any other cause of action, and hence carries the burden to establish its eligibility to a refund" by a preponderance of the evidence. *GATX Terminals Corp.*, 78 S.W.3d at 634.

In the district court, the Comptroller repeatedly argued that U.S. Concrete had the burden to "clearly show" its entitlement to relief, based on an incorrect assertion that the COGS subtraction should be treated like an exemption. *See Southwest Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016) (taxpayers must clearly show entitlement to an exemption). U.S. Concrete responded to the Comptroller's assertion in at least one of its district-court pleadings. Although nothing in the district court's judgment or findings of fact and conclusions of law references this heightened standard, U.S. Concrete argues "it is apparent" that the district court applied the heightened burden because the district court used the word "deduction" in its conclusion of law, rather than the word subtraction. In discussing the COGS calculation, we agree that, under the statute, an entity has the option to subtract its cost of goods sold. *See* Tex. Tax Code § 171.101(a)(1)(B) (an entity determines its taxable margin by "subtracting" the greater of certain amounts). However, the Texas Supreme Court has referred to the COGS subtraction as a "General Deduction," *In re Nestle*, 387 S.W.3d at 615, this Court has referenced the "COGS deduction," *e.g., Hegar v. Sunstate Equip. Co.*, No. 03-15-00738-CV, 2017 Tex. App. LEXIS 481, at *1 (Tex. App.—Austin Jan. 20, 2017, pet. filed) (mem. op.); *Gulf Copper*, 535 S.W.3d at 4 ; *Titan Transp.*, 433 S.W.3d at 627, and even the franchise tax statute appears to refer to the COGS subtraction as a deduction: section 171.101(a)(3) calls for subtracting from the entity's apportioned margin "any other allowable deductions," where use of the word "other" implies that the COGS subtraction

is also called a deduction.  We cannot conclude that use of the phrase "COGS deduction" in the district court's conclusion of law demonstrates the use of a heightened burden of proof, and we do not see any other evidence in the record that the court applied an incorrect burden of proof.  We overrule U.S. Concrete's third issue.

**Conclusion**

Having overruled each of U.S. Concrete's issues on appeal, we affirm the district court's judgment.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:   March 28, 2019