# IN THE SUPREME COURT OF TEXAS

No. 17-0894

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS,
AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,
PETITIONERS,

v.

GULF COPPER & MANUFACTURING CORPORATION, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

**Argued October 9, 2019**

JUSTICE LEHRMANN delivered the opinion of the Court.

In this franchise-tax case, the Comptroller determined that a taxable entity paid an insufficient amount for the 2009 tax year. The Comptroller and the entity disagreed about whether the entity, in calculating the amount of franchise tax owed, could exclude certain payments from its revenue under Texas Tax Code subsection 171.1011(g)(3) and include certain costs in its "cost of goods sold" ("COGS") subtraction under section 171.1012. The taxable entity paid the additional taxes under protest and sued to recover the disputed amount. The trial court rendered judgment for the taxpayer. The court of appeals affirmed with respect to the revenue exclusion, reversed with respect to the COGS subtraction, and remanded for further proceedings involving the proper calculation of the COGS subtraction. We agree with the court of appeals that the

Comptroller incorrectly disallowed the revenue exclusion. With regard to the COGS subtraction, we agree with the court of appeals that the subtraction must be calculated on a cost-by-cost basis and that the calculation method accepted by the trial court was improper. However, unlike the court of appeals, we hold that the taxpayer is not entitled to include costs under subsection 171.1012(i) in calculating its COGS subtraction. Accordingly, we affirm the court of appeals' judgment in part, reverse it in part, and remand the case to the trial court for further proceedings consistent with this opinion.

## I. Background

Gulf Copper and Manufacturing Corporation is in the business of surveying, repairing, and upgrading offshore oil-and-gas rigs for rig owners and drilling contractors who in turn use the rigs to drill offshore wells for exploration-and-production companies. The rigs are used to drill multiple wells, which are located all over the world. After completing a drilling project, a rig sits idle until a drilling contract calls for its use. At that point, the rig is brought to Gulf Copper's shipyards and drydocks, including those on the Texas coast. Gulf Copper then prepares the rig for its next drilling project in accordance with the applicable governmental regulations, certification requirements of marine classification societies, and contract terms of that project.

The process of preparing the rig begins with surveying the rig to determine what repairs and upgrades must be made. Gulf Copper's subsidiary Sabine Surveyors performs those surveys.[1] After the surveys are completed, repairs and upgrades commence. One example of a repair is the replacement of corroded portions of a rig's steel hull. That process involves cutting out corroded steel, cutting new plates of raw steel, sandblasting the new plates, coating and painting the new

---

[1] Throughout this opinion, "Gulf Copper" refers to both Gulf Copper and Sabine Surveyors.

2

plates, and fitting and welding the new plates onto the hull of the rig. Another example of a repair is sandblasting and painting parts of the hull that have not been replaced. An example of an upgrade is changing the size and configuration of bunkrooms to comply with a country's labor laws. Gulf Copper pays subcontractors to work along with its employees on those tasks.

During the accounting period for the 2009 tax year,[2] Gulf Copper experienced both an increase in business and a shortage of employees due to recent hurricanes that had damaged rigs and displaced workers. Gulf Copper thus engaged substantially more subcontractors than usual during the 2009 tax year.

Gulf Copper timely filed its 2009 Texas franchise-tax form, reporting that it owed $210,605 in taxes, and timely paid that amount. The Comptroller conducted a desk audit and determined that Gulf Copper had underpaid. The Comptroller concluded that Gulf Copper had improperly excluded from total revenue $79,405,230 in payments to subcontractors under subsection 171.1011(g)(3) of the Texas Tax Code, which allows revenue exclusions for certain subcontractor payments, or had improperly subtracted those payments as costs of goods sold under subsection 171.1012(i). The Comptroller further determined that Gulf Copper had improperly subtracted other survey, repair, and upgrade costs under subsection 171.1012(i) totaling $72,711,734. Concluding that Gulf Copper's records were inadequate to calculate the amount owed, the Comptroller used a "sampling audit method" to do so. TEX. TAX CODE § 111.0042. Based on that method, the Comptroller estimated Gulf Copper's subtractable cost of goods sold to be fifty percent of Gulf Copper's overall costs at its Galveston and Port Arthur facilities and five percent of Gulf Copper's costs at its Corpus Christi facility. The Comptroller calculated a tax deficiency

---

[2] The accounting period for the 2009 franchise-tax report year was May 1, 2007 to April 30, 2008.

of $692,626.66 plus interest—totaling $838,117.84—and demanded payment. Gulf Copper made the payment under protest and filed this suit in Travis County district court. *See id.* § 112.052.

The trial court held a bench trial and rendered judgment in favor of Gulf Copper. The court concluded that Gulf Copper was entitled to exclude from total revenue, under Tax Code subsection 171.1011(g)(3), its payments to subcontractors totaling $79,405,230; that Gulf Copper was entitled to subtract, as costs of goods sold under section 171.1012, the $72,711,734 in survey, repair, and upgrade costs not already excluded;[3] and that Gulf Copper's method of calculating its COGS subtraction was proper. In its final judgment, the trial court ordered the Comptroller to reimburse Gulf Copper the full amount it had paid under protest, plus interest and costs. The Comptroller appealed.

The court of appeals held that sufficient evidence supported the trial court's conclusion regarding Gulf Copper's entitlement to a revenue exclusion under subsection 171.1011(g)(3). 535 S.W.3d 1, 4, 13 (Tex. App.—Austin 2017). The court also concluded that the Comptroller had erroneously limited the costs that Gulf Copper was entitled to subtract under subsection 171.1012(i). *Id.* at 20. However, the court held that the method Gulf Copper used to calculate its COGS subtraction was improper and therefore reversed and remanded for a recalculation using the proper test. *Id.* at 4. The Comptroller petitioned this Court for review, arguing that the subsection 171.1011(g)(3) revenue exclusion does not apply to Gulf Copper's disputed payments to subcontractors and that subsection 171.1012(i) does not allow Gulf Copper to subtract its rig

---

[3] A taxable entity may not exclude an amount from total revenue and also subtract that amount as a cost of goods sold. TEX. TAX CODE § 171.1011(j). In the alternative to excluding subcontractor payments under subsection 171.1011(g)(3), the trial court held that Gulf Copper could subtract those payments as costs of goods sold, for a total COGS subtraction of $152,116,964.

4

survey, repair, and upgrade work that is not a direct cost of acquiring or producing a good. Gulf Copper filed a counter-petition, arguing that the method it used to calculate its COGS subtraction was proper.

## II. Discussion

Texas's franchise tax is imposed on the privilege of doing business in the state, *see In re Nestle USA, Inc.*, 387 S.W.3d 610, 621–22 (Tex. 2012), and applies to what the Legislature has denominated "taxable margin," TEX. TAX CODE § 171.101.[4] In general, an entity determines its franchise-tax obligation as follows. First, the entity must determine whether it is taxable or whether it is exempted from the franchise tax. *See id.* § 171.051. It must then calculate its "total revenue from entire business," and certain funds are excluded from that amount. *Id.* § 171.1011. The entity may then take one of several possible subtractions from its total revenue to arrive at its "margin." *Id.* § 171.101(a)(1). Next, the taxable entity multiplies its margin by the percentage of the taxable entity's gross receipts from business done in Texas to arrive at "apportioned margin." *Id.* §§ 171.101(a)(2), .106(a). Finally, the entity takes allowable deductions to arrive at its "taxable margin." *Id.* § 171.101(a)(3). The entity's tax obligation is a percentage of its taxable margin. *Id.* § 171.002.[5]

### A. Revenue Exclusion for Subcontracting Payments

To calculate its taxable margin, a taxable entity must first calculate its total revenue. *See id.* §§ 171.101, .1011. When calculating total revenue, the taxable entity may exclude from that amount, among other things, certain flow-through funds described in section 171.1011. One

---

[4] Unless otherwise noted, citations to the Tax Code are to the version applicable to the 2009 franchise-tax report year. Differences between the applicable version and the current version are noted where relevant.

[5] Tax credits and other tax rules and allowances may apply.

category of excluded flow-through funds encompasses certain payments to subcontractors described in subsection 171.1011(g)(3). For the 2009 tax year, subsection 171.1011(g)(3) provided:

> (g) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), only the following flow-through funds that are mandated by contract to be distributed to other entities:
>
> . . .
>
> (3) subcontracting payments handled by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of the boundaries of real property.

*Id.* § 171.1011(g)(3). The court of appeals held that all of the subcontractor payments Gulf Copper sought to exclude under subsection (g)(3) qualified for the exclusion because those payments were to provide services, labor, or materials "in connection with" the drilling of oil wells and because those payments qualified as "flow-through funds" pursuant to Gulf Copper's contracts with its subcontractors. 535 S.W.3d at 11–13. The Comptroller disputes both of those conclusions.

First, the Comptroller argues that none of the work that Gulf Copper's subcontractors did was "in connection with" the construction of improvements on real property and therefore Gulf Copper's payments to its subcontractors do not qualify for the exclusion. Second, the Comptroller argues that, even if the subcontractors' work was "in connection with" the construction of improvements on real property, the majority of Gulf Copper's payments to subcontractors were not "mandated by contract to be distributed to other entities" and therefore do not qualify for the exclusion.

6

## 1. "In Connection with" Requirement

The parties agree that the rig survey, repair, and upgrade work that Gulf Copper's subcontractors provided qualified as "services, labor, or materials" and that drilling an oil well qualifies as the "construction . . . of improvements on real property," but the parties disagree whether the work was "in connection with" the drilling of oil wells. If Gulf Copper's subcontractors had worked directly on oil wells, the subsection (g)(3) exclusion would undoubtedly apply. But Gulf Copper's subcontractors did not survey, repair, or upgrade oil wells; instead, the subcontractors' work was done on rigs that were subsequently used to construct oil wells. Thus, the issue is whether Gulf Copper's subcontractors' activities were sufficiently linked to the drilling of oil wells.

The court of appeals noted that the phrase "in connection with" is "one of intentional breadth, but not without logical limit." *Id.* at 12 (quotations omitted). The court of appeals' test for whether "services, labor, or materials" are provided "in connection with" the drilling of an oil well was whether there is a "reasonable connection" between the two, meaning a connection that is "more than tangential or incidental." *Id.* (quoting *Titan Transp., LP v. Combs*, 433 S.W.3d 625, 638–39 (Tex. App.—Austin 2014, pet. denied)).

Using that test, the court of appeals determined that Gulf Copper's work that rendered rigs "able to perform the drilling services required to drill a particular well" qualified for the (g)(3) revenue exclusion. *Id.* The court of appeals considered it a closer question whether "work that makes a rig compliant with general requirements imposed by marine classification societies or with state and federal regulations generally applicable to offshore drilling rigs and their operations" also qualified for the exclusion. *Id.* But the court did not answer that question; instead, it held

7

that, because the Comptroller argued only that none of Gulf Copper's payments to subcontractors qualified for the (g)(3) exclusion, the Comptroller failed to preserve the argument that some of those payments qualified but others did not. *Id.* at 12–13.

Turning to the parties' arguments, the Comptroller concedes, in agreement with the court of appeals, that "in connection with" broadens the scope of work to which the (g)(3) exclusion applies beyond the actual "design, construction, remodeling, or repair of improvements on real property." However, the Comptroller insists that the work at issue in this case is too remote from those activities to be "in connection with" them. Specifically, the Comptroller argues that Gulf Copper's work is temporally remote because it occurs before drilling; physically remote because it occurs in waterfront yards away from the drilling site; and contractually remote because Gulf Copper's contracts are not with well owners, but with rig owners and others who in turn contract with those well owners. The Comptroller acknowledges that Gulf Copper's work is necessary and essential for the drilling of oil wells but argues that if all subcontracting payments for necessary and essential work were excludable, the exclusion would be so broad as to do away with the franchise tax in the real-estate-development and oil-and-gas industries.[6]

On the other end of the spectrum, Gulf Copper argues that the phrase "in connection with" is one of expansive breadth and that even a tangential relationship is enough to put Gulf Copper's work "in connection with" the construction of improvements on real property. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900–01 (Tex. 2017) (interpreting the phrase "in

---

[6] The Comptroller also argues that if the text is ambiguous, it should be construed against the taxable entity because the revenue exclusion is a tax exemption. We do not address that argument because the text is unambiguous.

8

connection with" in the Texas Citizens Participation Act and holding that a "tenuous or remote relationship" was sufficient).

While the phrase "in connection with" undoubtedly broadens the scope of the exclusion beyond work done directly on a well or other real property, the extent of that expansion is what is at issue here. *See Aleman v. Tex. Med. Bd.*, 573 S.W.3d 796, 802 (Tex. 2019) ("Typically, when applying statutes requiring a connection between two things, our analysis hinges on how direct that connection must be."). Chapter 171 of the Tax Code does not define "in connection with" or provide any related definitions. In the absence of a statutory definition, "we must give a term its commonly accepted meaning." *Gilbert v. El Paso Cty. Hosp. Dist.*, 38 S.W.3d 85, 89 (Tex. 2001). Additionally, it is "a fundamental principle of statutory construction that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used." *Willacy Cty. Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, 555 S.W.3d 29, 39 (Tex. 2018). Webster's defines the noun "connection" as "the act of connecting: a coming into or being put in contact"; "the state of being connected or linked"; and "relationship or association in thought (as of cause and effect, logical sequence, mutual dependence or involvement)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002).[7] "Generally, the use of the phrase 'in connection with' does not imply a material or significant connection although context may indicate otherwise." *Tarrant County v. Bonner*, 574 S.W.3d 893, 898 (Tex. 2019). Therefore, to determine whether the

---

[7] Webster's similarly defines the adjective "connected" as "joined or linked together" and "having the parts or elements logically related or continuous"; defines the transitive verb "connect" as "to join, fasten, or link together usu[ally] by means of something intervening" and "to place or establish in any of various intangible relationships (as . . . a relationship of things similar in purpose, motivation, configuration, or substance)"; and defines the intransitive verb "connect" as "to have a relationship." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002).

Legislature intended for the phrase "in connection with" in subsection 171.1011(g)(3) to imply more than a tangential connection, we must look to the phrase's statutory context.

In chapter 171, the Legislature has enacted an extensive and detailed set of rules that differentiate in highly specific ways between types of entities and the types of activities in which they engage. For example, subsection 171.1011(g-10) applies to an "entity that is primarily engaged in the business of transporting barite . . . a mineral used as a weighing agent in oil and gas exploration," and subsection (g-11) applies to an "entity that is primarily engaged in the business of performing landman services."[8] Subsection (g)(3) itself includes a specific list of activities that the work of the taxable entity's subcontractors must be "in connection with," namely "design, construction, remodeling, or repair of improvements on real property." Thus, given chapter 171's detailed requirements, we conclude that "in connection with" in subsection (g)(3) requires more than a remote, tangential relationship to the requisite design, construction, remodeling, or repair of real-property improvements.

Notwithstanding that requirement, we agree with Gulf Copper that the rig survey, repair, and upgrade work provided by its subcontractors is "in connection with" the drilling of oil wells. The requisite connection between the two is not one of physical, temporal, or contractual proximity, as the Comptroller urges. Rather, that connection is borne out by the trial court's unchallenged findings of fact. The trial court found that "Gulf Copper's work enables the rigs (1) to meet and maintain the certification requirements imposed by classification societies, (2) to comply with governing regulations, and (3) to satisfy an exploration and production ('E&P')

---

[8] The Legislature added these subsections in 2013, with an effective date of January 1, 2014. Act of May 27, 2013, 83d Leg., R.S., ch. 1232, § 7, 2013 Tex. Gen. Laws 3106, 3107 (codified at TEX. TAX CODE § 171.1011(g-10), (g-11)).

10

company's contractual requirements for a specific drilling project." The trial court further found that "[a] rig cannot be used for drilling unless it is properly certified, compliant, and satisfies the contractual requirements for the project." In light of the trial court's findings that Gulf Copper's work was a necessary component of enabling the rigs to drill specific wells, we hold that Gulf Copper provided its services and labor "in connection with" the drilling of those wells for the purpose of subsection (g)(3).

### 2. "Mandated by Contract" Flow-Through Requirement

As noted, subsection 171.1011(g) generally allows a taxable entity to exclude certain "flow-through funds that are mandated by contract to be distributed to other entities," including those funds that qualify under subsection (g)(3). TEX. TAX CODE § 171.1011(g). The Comptroller argues that, even if Gulf Copper's payments to subcontractors satisfy subsection (g)(3) specifically, the majority of those payments are not "mandated by contract to be distributed to other entities" and therefore are not "flow-through funds" that qualify for the exclusion. The court of appeals disagreed with the Comptroller and held that because Gulf Copper was obligated by its contracts with its subcontractors to pay the subcontractors for their work, Gulf Copper had met subsection (g)'s flow-through requirement. 535 S.W.3d at 10–11. We agree with the court of appeals and hold that Gulf Copper's subcontractor payments met the flow-through requirement of subsection 171.1011(g).

The Comptroller's analysis begins with Gulf Copper's contract with its customer. According to the Comptroller, it is that contract that must mandate the distribution of funds to other entities. Gulf Copper's relevant contracts with its customers provided one of two compensation methods for work provided. Under the "hourly" method, the customer was required

11

to pay Gulf Copper an hourly rate that was approximately fifteen to twenty percent more than Gulf Copper anticipated its costs would be, thereby generating an unspecified profit margin for Gulf Copper. Under the "cost-plus" method, the customer was required to pay Gulf Copper its cost of paying subcontractors plus a specified percentage of that cost (usually between fifteen and twenty percent), thereby generating a contractually specified profit margin for Gulf Copper.

The Comptroller argues that Gulf Copper's cost-plus contract provisions met the flow-through requirement contained in subsection 171.1011(g) but that the hourly contract provisions did not. The key distinction, the Comptroller asserts, is that the cost-plus provisions allocated exactly how much of the customer's payment would go to Gulf Copper and how much Gulf Copper would pay to other entities, while the hourly provisions left open the allocation of funds. In other words, under a cost-plus provision, Gulf Copper was required to pay funds to other entities in order to receive payment from its customer covering those costs, but under an hourly provision, Gulf Copper could use the payments from its customer as Gulf Copper saw fit. Therefore, only the cost-plus provisions "mandated" that funds be "distributed to other entities." *See* TEX. TAX CODE § 171.1011(g).

However, as the court of appeals noted, the Comptroller's argument rests on the faulty premise that under subsection 171.1011(g), the only contract that can mandate the distribution of funds to other entities is the taxable entity's contract with its customer. *See* 535 S.W.3d at 11. A taxable entity's contract with a subcontractor is no less a contract than that entity's contract with

12

a customer, and subsection 171.1011(g) does not include language suggesting a distinction between the two. *See* TEX. TAX CODE § 171.1011(g).[9]

The Comptroller advances several arguments in support of its position that the "contract" in subsection (g) must be the contract between the taxable entity and its customer, but none of those arguments are persuasive. First, citing subsection (g)'s reference to funds that are mandated by contract to be distributed to "other entities," the Comptroller contends that such entities do not include those that are parties to the contract containing the mandate. Here, Gulf Copper and its customer would be the parties to the contract, and the subcontractors would be the "other entities." The Comptroller argues that, to be entitled to the subsection (g)(3) exclusion, Gulf Copper's contracts with its customers must specifically require that payments be made to third parties like subcontractors. But in context, the term "other entities" is not used to make a distinction between parties and non-parties to a contract. Rather, the term "other entities" is used to distinguish between the "taxable entity" and entities besides the taxable entity. Indeed, the only specific "entity" mentioned in subsection 171.1011(g) is the "taxable entity." *Id.* § 171.1011(g) ("A *taxable entity* shall exclude from its total revenue . . . only the following flow-through funds that are mandated by contract to be distributed to *other entities* . . . ." (emphasis added)). Under subsection (g)'s plain language, Gulf Copper's contracts with its subcontractors, which require payment to entities other than Gulf Copper, qualify as the pertinent "contract."

---

[9] The current version of subsection 171.1011(g), not applicable here, excludes "flow-through funds that are mandated by contract *or subcontract* to be distributed to other entities" and that are "subcontracting payments *made under a contract or subcontract entered into* by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property or the location of the boundaries of real property." TEX. TAX CODE § 171.1011(g)(3) (new language emphasized).

The Comptroller also cites subsection 171.1011(i) to support his argument that the "contract" in subsection (g) must be Gulf Copper's contracts with its customers. Subsection (i) provides in its entirety that "[e]xcept as provided by Subsection (g), a payment made under an ordinary contract for the provision of services in the regular course of business may not be excluded." *Id.* § 171.1011(i). According to the Comptroller, subsection (i) shows that the Legislature did not intend to allow revenue exclusions based on "ordinary contract[s]." But subsection (i) provides an exception to its general prohibition of exclusions based on such contracts, and that exception is subsection (g). *Id.* Thus, rather than supporting the Comptroller's argument, subsection (i) confirms that subsection (g), when applicable, allows an exclusion even for an "ordinary contract . . . in the regular course of business." *Id.*

Moreover, we do not read the phrase "mandated by contract" to mean that a contract must contain language designating specific funds to be passed through the taxable entity on their way from the customer to the subcontractor. Instead, "mandated by contract" in this context simply means that the taxable entity's obligation to pay its subcontractor is a contractual one, and "flow-through" means that the customer is compensating the taxable entity for that subcontractor's work. This compensation necessarily flows through the taxable entity because the taxable entity, under its contractual obligation to the subcontractor, cannot exercise discretion in retaining the funds. As a general matter, "subcontracting payments" are payments the taxable entity makes to another entity to do work or provide materials that the taxable entity is in turn obligated to provide its customer and for which that customer is compensating the taxable entity. Because the taxable entity is contractually obligated to pay its subcontractors to do that work, the funds are "mandated by contract" to flow through the taxable entity to the subcontractor. In this way, the taxable entity's

14

customer contracts and subcontracts work together to flow the relevant funds from the customer, through the taxable entity, and to the subcontractor providing services, labor, or materials. Thus, subsection (g) does not require funds to be earmarked in a contract, and "mandated by contract" requires only that there be a contract or subcontract in place requiring that the taxable entity's subcontractors be paid.

The record in this case supports the trial court's finding that Gulf Copper's contractual mandate to distribute flow-through funds to its subcontractors is contained within its customer contracts and subcontracts and is supported by accounting records. This evidence shows that Gulf Copper's payments to subcontractors under the hourly method, like its payments under the cost-plus method, qualify as flow-through funds excludable from revenue under subsection 171.1011(g). Gulf Copper presented testimony that its hourly customer contracts include a certain rate per hour for labor and its subcontracts require it to pay subcontracting laborers a lower specified rate per hour, which is the amount Gulf Copper seeks to exclude under subsection (g)(3). The only distinction between the cost-plus method and the hourly method is that the subcontractor's rate of pay is specified in the customer contract under the cost-plus method, but in the subcontract under the hourly method. As we have explained, that is a distinction without a difference for purposes of the subsection 171.1011(g)(3) exclusion.

Moreover, evidence at trial indicated that Gulf Copper uses its accounting and invoicing practices to ensure customer payments properly flow through to its subcontractors. Regarding accounting, Gulf Copper introduced evidence that it uses the accrual method, linking each project's revenue to its costs and each cost to the pertinent material or labor provider. For each dollar of revenue owed to Gulf Copper by the customer, Gulf Copper incurs an associated cost. Payment

15

to subcontractors is made after Gulf Copper receives payment from the associated customer.[10] Similarly, Gulf Copper's invoicing practices connect its customer-paid revenues to its subcontractor costs. Gulf Copper receives subcontractor invoices, uses those invoice amounts to calculate its expected payment from the customer, passes on copies of the subcontractor invoices with its own to the customer, and pays its subcontractors after receiving payment from the customer.

In sum, we hold that the applicable version of subsection 171.1011(g) does not include the requirement that a general contract mandate the transfer of specific funds to a subcontractor. The record supports the trial court's finding that Gulf Copper's payments to its subcontractors pursuant to its contracts with those subcontractors qualified as "flow-through funds that are mandated by contract to be distributed to other entities." *Id.* § 171.1011(g). We therefore agree with the court of appeals that Gulf Copper was entitled to exclude all its disputed subcontractor payments under subsection 171.1011(g)(3).

### B. Cost-of-Goods-Sold Subtraction

As explained, after a taxable entity calculates its total revenue, it takes a subtraction from total revenue to calculate its margin, which is used in turn to calculate the amount of franchise tax owed. When making that subtraction, the taxable entity may subtract one of several categories listed in section 171.101,[11] and Gulf Copper chose to subtract an amount referred to as the "cost

---

[10] The customer has a strong interest in seeing subcontractors paid, as nonpayment could lead to a maritime-law lien on the customer's property, i.e., the rigs in this case.

[11] The taxable entity subtracts the category that results in the lowest margin. TEX. TAX CODE § 171.101(a)(1) (the taxable entity's margin is "the lesser of" the options provided).

16

of goods sold." *Id.* § 171.101(a)(1)(B)(ii)(a). As noted, this is commonly referred to as a COGS subtraction.

The provision governing the COGS subtraction defines "goods" as "real or tangible personal property sold in the ordinary course of business of a taxable entity." *Id.* § 171.1012(a)(1). Generally, the amount of the COGS subtraction includes "all direct costs of acquiring or producing the goods," *id.* § 171.1012(c), plus additional specified costs such as "deterioration of the goods," *id.* § 171.1012(d), and limited administrative and overhead costs, *id.* § 171.1012(f), but does not include other enumerated costs such as "distribution" and "rehandling" costs, *id.* § 171.1012(e). Ordinarily, a taxable entity may include a cost in its COGS subtraction only if the taxable entity "owns the goods," which it sells in the ordinary course of its business. *Id.* § 171.1012(i).

The Comptroller has determined that some of Gulf Copper's costs qualify for the COGS subtraction under subsections (c), (d), and (f), and those costs are not in dispute. For example, Gulf Copper manufactures steel plates that it installs on the hulls of oil rigs to replace parts of the hulls that have corroded, and the Comptroller agrees that those steel plates are "goods" under section 171.1012 and that Gulf Copper may subtract the costs of manufacturing and installing them. At issue is whether Gulf Copper may also include other costs under a limited extension of the allowable COGS subtraction contained in subsection 171.1012(i) and whether Gulf Copper's method of calculating its COGS subtraction was proper.

### 1. Applicability of Subsection 171.1012(i)

Subsection 171.1012(i) extends the scope of the COGS subtraction by providing that, despite the general requirement that the taxable entity own the goods:

> A taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance . . . of real property is

17

considered to be an owner of that labor or materials and may include the costs, as allowed by this section, in the computation of cost of goods sold.

*Id.* The Comptroller and Gulf Copper agree that drilling an oil well is "a project for the . . . improvement . . . of real property" but dispute both whether Gulf Copper's work involves "labor or materials" and whether Gulf Copper's work constitutes "furnishing" that labor or materials "to a [drilling] project." Gulf Copper argues that the costs associated with its work surveying, repairing, and upgrading oil rigs qualify for the COGS subtraction under the requirements of subsection (i). For example, Gulf Copper argues that the labor costs associated with painting the existing hull of an oil rig qualify for the COGS subtraction.

As discussed further below, the court of appeals concluded that the amount of a taxable entity's COGS subtraction must be calculated on a cost-by-cost basis and that Gulf Copper failed to use the proper calculation method. 535 S.W.3d at 14–15, 18, 20. Thus, without determining whether subsection (i) applies to any of Gulf Copper's particular disputed costs, the court of appeals remanded the case to the trial court for a proper calculation. *Id.* at 20. However, the court of appeals disagreed with the Comptroller's assertion that none of those costs could be properly included in the COGS calculation under subsection (i) and articulated what the court considered the proper test for making that determination. *Id.* at 14, 20. The court of appeals' test for whether subsection (i) applies to a taxable entity's work was to determine whether the work is an "essential and direct component" of the real-property project. *Id.* at 14 (quoting *Hegar v. CGG Veritas Servs. (U.S.), Inc.*, 581 S.W.3d 228, 232 (Tex. App.—Austin 2016, no pet.)). Because the Comptroller maintains that subsection (i) does not apply to any of Gulf Copper's disputed costs, we first address that question.

We begin by noting that despite some similarities, the language governing the applicability of the subsection 171.1011(g)(3) revenue exclusion discussed above—which allows a taxable entity to exclude certain subcontracting payments to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property—differs in significant respects from the language in the extension to the COGS subtraction contained in subsection 171.1012(i)—which applies to a taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance of real property. Thus, our holding that Gulf Copper is entitled to the 171.1011(g)(3) revenue exclusion does not determine whether Gulf Copper may take a COGS subtraction under subsection 171.1012(i).

As to subsection (i), the parties agree that drilling an oil well is "a project for the . . . improvement . . . of real property" and that providing labor or materials for the actual drilling of oil wells constitutes "furnishing labor or materials to" a well-drilling project. But they disagree as to whether Gulf Copper's activities, which occurred on oil rigs in Gulf Copper's shipyards and drydocks far from the drilling sites, fall within the scope of "furnishing labor or materials to" such well-drilling projects.

The Comptroller argues that subsection (i)'s language is narrower than the language of the subsection 171.1011(g)(3) revenue exclusion. We agree. The list of activities in the (g)(3) revenue exclusion includes "design," which occurs off-site, and is not limited to actual "design, construction, remodeling, or repair" but also includes "*proposed* design, construction, remodeling, or repair." *See* TEX. TAX CODE § 171.1011(g)(3) (emphasis added). The list of activities in subsection (i), on the other hand, is limited to activities that typically occur on-site, namely

"construction, improvement, remodeling, repair, or industrial maintenance," and does not include the "proposed" form of those activities. *See id.* § 171.1012(i). Furthermore, the phrase "in connection with" in the (g)(3) exclusion, discussed above, is an expanding term, while the phrase "furnishing . . . to" in subsection (i) is restricting language directed toward the real property on which the construction, improvements, or repairs are taking place. *See* 535 S.W.3d at 14 (noting that the work at issue must be a "direct component" of the real-property project to qualify under subsection (i)).

Gulf Copper's labor and materials were not directed toward real property, but toward preparing equipment for later use on real property. Specifically, Gulf Copper's contractual responsibilities were to inspect, repair, and upgrade equipment (i.e., oil rigs), which themselves were owned by other entities, that would subsequently be used by others on well-drilling projects in remote locations. As the Comptroller correctly points out, Gulf Copper's work on oil rigs in its waterfront yards was not itself a well-drilling project. Instead, Gulf Copper's labor and materials can be fairly characterized as having been furnished to its own project of fulfilling its contracts to repair and upgrade equipment and not to a project for the construction or improvement of real property. *See Sunstate Equip. Co. v. Hegar*, ___ S.W.3d ___, ___ (Tex. 2020) (holding that a taxable entity's delivery of heavy-construction rental equipment to and from job sites, where the equipment would be used by others as part of a real-property construction project, did not itself qualify as labor "furnished to a project for the construction or improvement of real property, within the meaning of [subsection (i)]"). In fact, when Gulf Copper performed work on oil rigs, those rigs were between drilling projects.

20

Gulf Copper, like the taxable entity in *Sunstate*, essentially proposes a but-for test for subsection (i), whereby labor or materials are furnished to a project for the construction or improvement of real property if the construction or improvement could not occur without them. As we explain in *Sunstate*, such a requirement finds no basis in subsection (i)'s text and would result in allowing "almost any labor [or materials to] be characterized as meeting that test, no matter how remote or indirectly related to the real property" at issue.[12] *Id.* at ___. Such a but-for test would be untenable, and subsection (i)'s restrictive language does not extend in that direction.

Therefore, we hold that under subsection 171.1012(i), the requisite labor or materials must be furnished to or incorporated into the real property itself. Gulf Copper did not furnish labor or materials to a project for the construction or improvement of real property within the meaning of subsection (i) because, to the extent that Gulf Copper furnished labor or materials, Gulf Copper furnished that labor and those materials to the oil rigs it surveyed, repaired, and upgraded, and those rigs—although subsequently used on well sites to drill wells—were not and did not become part of the wells or well sites themselves.[13] *See id.* at ___ (providing equipment to a real-property project does not in itself constitute furnishing labor to that project). Accordingly, like the taxable entity in *Sunstate*, Gulf Copper cannot be considered "an owner of that labor or materials" and may not use subsection (i) as a basis to include certain costs in its COGS subtraction.

---

[12] The Comptroller invites us to import the definitions of "labor" and "materials" from chapter 53 of the Texas Property Code into chapter 171 of the Tax Code, which defines neither term. Because we assume that Gulf Copper furnished labor and materials, we need not address that argument.

[13] "Material" is defined as "the basic matter (as metal, wood, plastic, fiber) from which the whole or the greater part of something physical (as a machine, tool, building, fabric) is made." WEBSTER'S THIRD INTERNATIONAL DICTIONARY (2002). Gulf Copper certainly furnished "materials" that were incorporated into the rigs, but it furnished nothing that was incorporated into the well or well site.

## 2. Costs Allowed Under Subsections 171.1012(c)–(f)

Notwithstanding our holding on subsection (i), Gulf Copper also argues that because some of its costs of preparing rigs to drill wells undisputedly qualify for subtraction under the general COGS provisions, i.e., subsections 171.1012(c), (d), and (f), it may include all costs of surveying, repairing, and upgrading rigs that are not otherwise expressly excluded, e.g., by subsection (e). Gulf Copper argues that its work surveying, repairing, and upgrading rigs is part of an integrated project of preparing those rigs to drill wells, and, because that project involves *some* production and acquisition of goods, Gulf Copper may subtract *all* of its costs associated with the overall project.[14] The Comptroller, on the other hand, argues that the only costs Gulf Copper may subtract are those costs shown to be independently includable under section 171.1012. Characterizing this issue as a question of the proper method of calculating the COGS subtraction, the court of appeals held that section 171.1012 "requires a cost-by-cost analysis to determine whether the cost fits one of the types and categories eligible for inclusion in the calculation." 535 S.W.3d at 18. We agree with the court of appeals that Gulf Copper was required to show that each of its costs independently qualified under section 171.1012.

As noted, subsection 171.1012(c) generally provides that the "cost of goods sold includes all direct costs of acquiring or producing the goods, including" a list of specific costs like labor,

---

[14] Gulf Copper also argues that all of its activities in preparing a rig to drill a well qualify as acts of production, but that is simply a variation on Gulf Copper's integrated-project argument: both are arguments for production by proximity. Under the latter, costs may be included because the activities are integrated with acts of production although they are not acts of production themselves, and under the former, costs may be included because the activities are acts of production themselves, but only in the sense that they are similar to other activities that are in fact acts of production. For example, Gulf Copper argues that painting is an "intermediate act[] of manufacture," but that is true only if it is in fact part of a manufacturing process. Determining whether painting is part of a manufacturing process requires inquiring into whether that painting in particular is part of a manufacturing process, not whether *some* of the taxable entity's painting is part of a manufacturing process.

22

materials, handling, and storage, among others. TEX. TAX CODE § 171.1012(c). Subsection (d) provides a list of additional costs that may be included in the cost of goods sold, *id.* § 171.1012(d), while subsection (e) enumerates "costs in relation to the taxable entity's goods" that are expressly excluded from the cost of goods sold, *id.* § 171.1012(e). Subsection (f) allows subtraction of up to four percent of "indirect or administrative overhead costs" that "are allocable to the acquisition or production of goods." *Id.* § 171.1012(f). Thus, the costs that may be subtracted under the general COGS provisions must relate to the acquisition or production of "goods" as defined in subsection (a)(1). *Id.* § 171.1012(a)(1) (defining "goods" as "real or tangible personal property sold in the ordinary course of business of a taxable entity").

Gulf Copper begins its argument with the premise that the scope of costs allowed under section 171.1012 is expansively broad. Gulf Copper argues that subsections (c) and (d) "openly allow[] subtractible [sic] costs" while subsections (e) and (f) "narrowly circumscrib[e] those limits," pointing, for example, to the fact that the list of costs in subsection (c) is not exhaustive. Gulf Copper thus submits that, as an entity that produces some "goods" as part of its project of preparing rigs to drill wells, it may include in its COGS subtraction all costs of that project so long as the costs are not specifically excluded or limited under subsections (e) and (f).

As further support for its argument that the scope of costs eligible for the COGS subtraction is expansively broad and that a taxable entity is not required to show that each cost independently qualifies for the subtraction, Gulf Copper points to subsection 171.1012(h), which reads in its entirety:

> A taxable entity shall determine its cost of goods sold, except as otherwise provided
> by this section, in accordance with the methods used on the federal income tax
> return on which the report under this chapter is based. This subsection does not

23

affect the type or category of cost of goods sold that may be subtracted under this section.

*Id.* § 171.1012(h). Gulf Copper takes the subsection's reference to "methods used on the federal income tax return" to mean that it was required to use the amount it had reported under Internal Revenue Code section 263A as the starting point for its COGS calculation.[15] Because Internal Revenue Code section 263A does not specify which costs are eligible for a tax subtraction in the same way that section 171.1012 does, Gulf Copper argues that a showing of independent qualification for the COGS subtraction for each cost is not necessary and is in fact prohibited.

When calculating its COGS subtraction for the 2009 franchise-tax report year, Gulf Copper used the amount it had reported under Internal Revenue Code section 263A as its starting point. Gulf Copper then subtracted from that amount those costs that are expressly disallowed by subsection 171.1012(e) and limited by subsection 171.1012(f). The result was the amount Gulf Copper used as its cost of goods sold.

Gulf Copper's approach to including costs in its COGS subtraction is flawed for several reasons. First, the Legislature enacted a detailed set of requirements and provided that the allowable "costs" must meet those requirements. *See, e.g.*, *id.* § 171.1012(c) ("The cost of goods sold includes all direct *costs* of acquiring or producing the goods, including . . . ." (emphasis added)), (d) ("The cost of goods sold includes the following direct *costs* in relation to the taxable entity's goods." (emphasis added)). By section 171.1012's plain terms, only the costs that meet those statutory requirements may be subtracted.

---

[15] Internal Revenue Code section 263A applies to "[r]eal or tangible personal property produced by the taxpayer" and "[r]eal or personal property described in section 1221(a)(1) which is acquired by the taxpayer for resale," and provides which costs of that property must be treated as inventory costs and which costs must be capitalized. 26 U.S.C. § 263A(a)–(b).

Additionally, subsection 171.1012(h) states twice that federal methods do not govern the substance of the COGS calculation: first when it subordinates its requirements to other provisions of section 171.1012 with the proviso "except as otherwise provided by this section," and second when it explicitly provides that "[t]his subsection does not affect the type or category of cost of goods sold that may be subtracted under this section." *Id.* § 171.1012(h). Therefore, federal methods are to be used only when there are gaps in the Texas statute. For example, as the court of appeals noted, because the Tax Code gives no specific instruction as to what accounting method a taxable entity must use in calculating its costs under section 171.1012 (e.g., cash or accrual), a taxable entity must use the same accounting method it used on its federal return. *See* 535 S.W.3d at 17. Subsection 171.1012(h) thus does not affect the specific mandates contained in other parts of section 171.1012, such as the detailed requirements of subsections (c) through (f), which are the core of the COGS subtraction.[16] Accordingly, whether a particular cost may be included in the COGS subtraction is not dependent on whether a taxable entity engages in some qualifying activities but rather on whether that cost independently meets the requirements of section 171.1012.

Finally, Gulf Copper argues that using a cost-by-cost method will be burdensome on its business. But, even assuming the relevance of that argument, the applicable version of the Tax Code provides an efficient alternative for calculating margin: multiply total revenue by 0.7. *See*

---

[16] Gulf Copper reads too much into subsection (g), which provides a limited instance in which a taxable entity subject to Internal Revenue Code section 263A must utilize its federal tax return. TEX. TAX CODE § 171.1012(g) ("If the taxable entity elects to capitalize [rather than expense] costs, it must capitalize each cost allowed under this section that it capitalized on its federal income tax return.").

*id.* § 171.101(a)(1)(A). If a taxable entity wishes to avail itself of a COGS subtraction, it must be willing to meet the concomitant requirements.

Gulf Copper alternatively asserts that it in fact met those requirements and demonstrated that "the remaining costs were within the scope of the non-exhaustive list of costs allowed by (c) and (d)." In light of our conclusions that the methodology accepted by the trial court was incorrect and that none of Gulf Copper's costs qualify for inclusion in its COGS subtraction under subsection (i), we think this argument is best considered by the trial court on remand. While we see no basis for either party to reopen the record, the parties may present argument to the trial court on remand regarding whether the record evidence supports Gulf Copper's assertion that its costs independently qualify for the COGS subtraction under subsections (c) through (f) and, in turn, that the amount of Gulf Copper's subtractable costs was greater than the amount the Comptroller calculated using a sampling audit method.[17]

## III. Conclusion

We agree with the trial court and the court of appeals that Gulf Copper was entitled to exclude from its revenue the full $79,405,230 in subcontractor payments under subsection 171.1011(g)(3), and we affirm the court of appeals' judgment in that respect. We further agree with the court of appeals that the COGS subtraction under section 171.1012 must be calculated on a cost-by-cost basis. However, we disagree with the court of appeals' holding that some of Gulf

---

[17] Our holding that costs must independently qualify for subtraction under section 171.1012 in no way detracts from the validity of an audit conducted using the sampling audit method under Tax Code section 111.0042, as the court of appeals suggested it might. *See* 535 S.W.3d at 20. Rather, the Comptroller's use of a sampling method is governed by section 111.0042's parameters. *See* TEX. TAX CODE § 111.0042(b) (detailing when such methods are appropriate), (d) (providing that a transaction in a sample period will be separately assessed if the taxpayer demonstrates that the transaction is not representative of the taxpayer's business operations), (e) (requiring dismissal of the audit as to that portion established by projection based on a sampling method that the taxpayer demonstrates was not in accordance with generally recognized sampling techniques).

Copper's costs may be included in its COGS subtraction under subsection 171.1012(i). Finally, we hold that the parties may present argument to the trial court on remand as to whether, under the existing record, the amount of Gulf Copper's subtractable costs utilizing a proper cost-by-cost calculation method exceeds the amount of the COGS subtraction allowed by the Comptroller. Accordingly, we affirm the court of appeals' judgment in part, reverse it in part, and remand the case to the trial court for further proceedings consistent with this opinion.

_____

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** April 3, 2020

27